1  Andrea J. Shaw
   State of New Hampshire
2  Banking Department
   64B Old Suncook Road
3  Concord, NH 03301

4
                    State of New Hampshire Banking Department
5

6
   In re the Matter of:              ) Case No.: 06-087
7                                     )
   State of New Hampshire Banking     ) Cease and Desist Order
8                                     ) Staff Petition
   Department,                        )
9                                     )
              Petitioner,             )
10                                    )
         and                          )
11                                    )
   MAK Investments, Brian Colsia, Gabe )
12                                    )
   Cohen, and Laura Cohen,            )
13                                    )
              Respondents            )
14  _____ )

15
                          STATEMENT OF FACTS
16
   I.   The staff of the Banking Department, State of New Hampshire (hereinafter
17
   referred to as the "Department") alleges the following facts:
18
                 Mortgage Banking and/or Brokering - RSA 397-A
19
     1. MAK Investments LLC (hereinafter "MAK") offers loans secured by a
20
        mortgage to individuals facing foreclosure.
21
     2. MAK is not licensed to conduct mortgage banking or brokering activities
22
        in New Hampshire, nor do they qualify for an exemption from licensure
23
        pursuant to RSA 397-A:4.
24
     3. MAK registered as a domestic limited liability company with the New
25
        Hampshire Secretary of State on May 4, 2004.  Its sole manager is Brian



                          Cease and Desist Order - 5

W. Colsia.  Its principal address is 270 Main Street, Manchester, New Hampshire.

4. Mr. Gabriel Cohen and Mrs. Laura Cohen are employees or agents of MAK. Hereinafter Mr. Colsia, Mr. Cohen and Mrs. Cohen and MAK shall be referred to collectively as "MAK".

Consumer A:

5. Consumer A is the owner and occupant of a single family home on certain real estate located at 639 Old Country Road South, Francestown, NH (herein after "Premises A").

6. Premises A is subject to a first mortgage held by CitiCorp Mortgage Inc. ("CitiCorp").  Premises A is also subject to a second mortgage held by TD BankNorth, N.A.

7. Consumer A defaulted on the obligation to CitiCorp.  As a result of this default, on or about May 11, 2005, Consumer A received a Notice of Mortgage Foreclosure Sale scheduled to be held at public auction at Premises A on June 9, 2005.

8. For reasons not germane to the issue at hand, the foreclosure auction was postponed until July 6, 2005.

9. Prior to the foreclosure auction initially scheduled for June 9, 2005 a representative of MAK, Mr. Gabe Cohen, contacted Consumer A with a proposal to stop the foreclosure action.

10. Through Mr. Cohen MAK offered Consumer A "short term lending" assistance with an underlying mortgage securing the loan, or, alternatively acquisition of the property prior to the foreclosure.

11. Consumer A initially declined the offer as she was attempting to obtain other financing.

12. Despite her efforts Consumer A was not able to obtain alternate financing.

13. Consumer A  contacted MAK on July 5, the night before the scheduled July 6 foreclosure.

14. On the evening of July 5 Mr. Cohen on behalf of MAK offered what Consumer A understood to be an unsecured loan in the amount necessary to reinstate the mortgage loan to Citicorp and stop the foreclosure sale.

15. Consumer A inquired as to the cost of the loan.  Mr. Cohen told Consumer A "what you borrow is what you pay". Consumer A did not understand that meant she would pay back the principal plus the same amount borrowed as a finance charge.

16. Consumer A did not receive any written information regarding this unsecured loan until the next morning, the morning of the foreclosure sale.

17. On July 6, 2005 Consumer A attempted to meet Mr. Cohen at his office at 649 Second Street, Ste 2, Manchester, NH 03102 for the purposes of consummating the unsecured loan prior to the foreclosure sale that day.

18. Mr. Cohen was not available when Consumer A arrived at his office.

19. Mrs. Laura Cohen, Mr. Cohen's wife, was present at the office and she indicated that Mr. Cohen was not available, but she had all of the documentation needing Consumer A's signature.

20. Mrs. Cohen presented Consumer A with a document entitled "Affidavit in Lieu of Promissory Note" ("Affidavit").  Under the terms of the Affidavit, MAK agreed to lend Consumer A $15,100.30 for purposes of stopping the scheduled foreclosure.

21. The Affidavit required Consumer A to sign a Note with the specific terms of the lending arrangement between MAK and Consumer A at a later unspecified date.

22. The Affidavit required Consumer A to repay $30,200.60 to MAK on July 6, 2006, 12 months from the execution date of the Affidavit.

23. At this time Mrs. Cohen produced a deed conveying ownership of the property from Consumer A to MAK.

24. Consumer A questioned why she was being asked to sign a deed for what she thought was an unsecured loan.

25. Mrs. Cohen told Consumer A that the deed would only be recorded in the event that Consumer A defaulted on the terms of the agreement.

26. The Affidavit would remain in affect until Consumer A received and signed the promissory note according to the terms stated in the Affidavit.

27. At no time while executing the above referenced documents was Consumer A made aware that the terms stated in the promissory note (which she had not seen) would differ from the terms included in the affidavit.

28. MAK tendered funds required to stop the Citicorp foreclosure.

29. Three weeks after stopping the foreclosure, Consumer A still had not received the aforementioned promissory note.

30. Consumer A emailed Mr. Cohen to inquire as to when she would receive the promissory note.

31. In response to the e-mail the promissory note was faxed to Consumer A on July 24, 2005.

32. Consumer A told Mr. Cohen that she wished to have her attorney review the documentation prior to execution of said documents.

33. In response, Mr. Cohen told Consumer A she must sign the note and provide MAK a check for the amount of her CitiCorp mortgage by the end of the day.

34. MAK stated the check should be made payable directly to MAK (not to CitiCorp.)

35. There are at least three (3) similar Promissory Notes filed in County Registry of Deeds throughout New Hampshire.

36. Two (2) were filed with the Registry after September 12, 2005, with one being filed prior to September 12, 2005.

37. The promissory note required that all first mortgage payments to the holder of the first mortgage (CitiCorp) must be made directly to MAK and MAK would forward the payment to CitiCorp.

38. The first mortgage payment, if made by check, should be made payable to MAK not CitiCorp according to MAK's instructions.

39. Once Consumer A became aware of this new requirement, she refused to sign the note on the advice of her attorney.

40. Concerned about defaulting on her first mortgage, Consumer A wrote a check directly to CitiCorp and then sent the CitiCorp check to MAK.

41. Consumer A stated that MAK agreed to this change.

42. Upon review of the promissory note, its terms differed greatly from the signed Affidavit.

43. In addition, Consumer A stated that the verbal agreement between she and MAK differed from both the Affidavit and the unsigned promissory note.

44. Consumer A and Mr. Cohen set up a meeting at the Second Street office for Monday, July 27, 2005 to turn over the Citicorp check. Neither Mr. Cohen nor anyone else was present at the office.

45. On August 3, 2005, Mr. Cohen delivered an eviction notice to Consumer A stating that the terms of the unsigned promissory note had been breached.

46. According to the terms of the Affidavit as presented to Consumer A no interest or principal payments were due to MAK until the end of a 12 month period, which ended on July 6, 2006.

47. CitiCorp contacted Consumer A with refinancing options in August 2005.

48. On August 9, 2006 MAK recorded the deed, purportedly held as security for repayment, claiming Consumer A breached their agreement. The deed is recorded in the Hillsborough County Registry of Deeds in Book 7520 Page 2998.

49. As a result of MAK recording the deed prior to consummation of the refinance, Consumer A was unable to payoff the MAK mortgage.

50. Since MAK filed the deed, Consumer A has not received any tax bills or other legal documents relating to the property, as they are sent directly to MAK.

51. As a result, CitiCorp has paid the taxes our of Consumer's A escrow account.

52. Consumer A's town welfare was cancelled because she no longer owns property in the town, which is a prerequisite for receiving town welfare assistance.

53. Consumer A could not make her payment to CitiCorp. MAK made mortgage payments for five months, and then stopped making payments. CitiCorp told Consumer A to make payments by the 24th of each month.

54. Once Mak filed the deed, Mak began eviction proceedings against Consumer A.

55. Consumer A had retained an attorney who was able to get an injunction from the court to temporarily prevent the eviction. However, the

attorney has since withdrawn from the matter. A trial is set for August 2006.

56. As part of the eviction case MAK and Consumer A attempted mediation. No settlement was reached.

57. MAK is now treating Consumer A as a tenant and indicated they want a contractor to start making repairs on Premises A.  MAK also stated that they do not have to give Consumer A prior notice before entering Premises A.

58. Currently Consumer A is still in her home contesting the eviction and transfer of ownership of Premises A.

Consumer B:

59. Consumer B is the owner of a single family residence located on certain real estate at 549 Pembroke Street, Pembroke, New Hampshire (herein after "Premises B").

60. Premises B is subject to a mortgage in first position held by Conti Mortgage Corp (hereinafter "Conti").  The mortgage loan is currently serviced by Select Portfolio Servicing Inc. ("SPS").

61. Sometime during early 2005 Consumer B defaulted on the obligation owed to Conti.

62. As a result, SPS placed the mortgage in foreclosure.

63. On the morning of the foreclosure action, April 27, 2005, representatives of MAK Investments, LLC ("MAK"), including Mr. Gabe Cohen, approached Consumer B at her home, Premises B, with a proposal to stop the foreclosure action.

64. Consumer B was not aware that a foreclosure sale was scheduled for later that day until MAK representatives arrived and notified Consumer B.

65. Consumer B subsequently confirmed with SPS that a foreclosure sale was set for 1:00 pm that day.

66. MAK proposed either short or long term loan financing, or acquisition of the property prior to the foreclosure.

67. On the scheduled date of the foreclosure action, at approximately 1:00 pm, Consumer B, Mr. Cohen, and Mr. Brian Colsia met to sign paperwork.

68. MAK did not give Consumer B any financing disclosures or copies of signed documents.

69. Consumer B later learned that the paperwork was a Purchase and Sale Agreement for the SPS payoff amount, plus $10,000 to Consumer B. The agreement also provided that Consumer B had 30 days to pay back the amount loaned plus $25,000, all costs to buyer, including tax stamps and expenditures. In addition, the agreement required Consumer B to obtain a commitment letter for the financing of the sale of the property by May 13, 2005.

70. If the aforementioned conditions were not met, Consumer B was required to vacate the property by May 27, 2005. If Consumer B failed to vacate Premises B May 27, $100 a day was to be deducted from the $10,000 MAK owed Consumer B, which was part of the purchase price stated in the above referenced agreement.

71. Consumer B stated that later on the same day of the scheduled foreclosure sale MAK sold Premises B to a Mr. T. Richards, via a warranty deed.

72. The warranty deed was recorded in the Merrimack County registry in Book 2770 Page 0395, on April 27, 2005.

73. It is unclear how MAK obtained marketable title to convey Premises B to Mr. Richards.

74. On May 2, 2005, SPS posted receipt of $66,000, removing the mortgage loan on Premises B from foreclosure status.

75. May 4, 2005 Mr. Richard granted a mortgage to MAK as evidenced in the County Registry at Book 2773 Page 0173.

76. Meanwhile, Consumer B requested copies of the documentation Consumer B signed from MAK.

77. After several requests MAK faxed what they insisted was the only paperwork Consumer B required on May 10, 2005, including a financing extension allowing Consumer B until May 23, 2005 to pay approximately $175,000 to MAK and reclaim title to her home.

78. The next day, May 11, 2005, Consumer B received a mortgage bill from SPS in the amount of $674.57.

79. On May 25, 2005, MAK discharged the mortgage from Mr. Richards in the county registry in Book 2895 Page 0597.

80. July 30, 2005 SPS received a payment in the amount of $2,000, which was paid by check from MAK.  The memo line of the check stated Consumer B's name and Premise B's address.

81. On March 28, 2006 Consumer B entered into a forbearance agreement with SPS.

82. Three days later on March 31, 2006, SPS received another payment of $1,000 which was paid through Western Union, with Consumer B's name and account number listed on it.

83. On May 25, 2006, a Mr. Gabriel Bilc recorded a warranty deed granting the premises from Mr. Richards to Mr. Gabriel Bilc.

Cease and Desist Order - 13

84. Immediately upon obtaining title, Mr. Bilc granted a mortgage on Premises B to MAK.

85. At present it appears the property is owned by Mr. Bilc, but how he obtained marketable title is unclear.

Consumer C

86. Consumer C is the owner of a single family residence located on a certain real estate at 40 Trail View Drive, Gilford, NH (herein after "Premises C").

87. As of March 2006, Premises C was subject to a mortgage in first position held by Novastar Mortgage Inc (hereinafter "Novastar").   Premises C was also subject to a mortgage in second position by MAK Investments LLC ("MAK").

88. In June 2005, Consumer C was experiencing difficulty in obtaining mortgage statements from Novastar.

89. When Consumer C inquired as to the reason Novastar was not sending statements, Novastar stated it (Novastar) did not hold a mortgage to Premises C.   However, it was later discovered that Novastar did hold a mortgage on Premises C.

90. Consumer C was unable to determine the amount of and location where a payment should be sent as Novastar repeatedly told Consumer C they did not hold a mortgage on Premises C.

91. Consumer C was unable to send timely mortgage payments to Novastar due to Novastar's confusion.

92. As a result Novastar placed Consumer C into foreclosure.

93. A business card containing Mr. Colsia's name as representative for MAK was left at Consumer C's house offering assistance with Consumer C's current foreclosure situation.

94. Consumer C contacted MAK and on June 23, 2005. Consumer C signed a Note and Mortgage with MAK.  According to the terms of the loan MAK would advance $11,150.22 in principal to Novastar.  In return Consumer C would play MAK $4,000 in interest and pay MAK the principal in full 6 months from executing the loan.  In addition, Consumer C would make monthly payments of $300 in interest to MAK.

95. Additionally, MAK required the first mortgage payment (to Novastar) in the amount of $1,216.22 to be sent to MAK and MAK would forward the payment to Novastar.

96. The loan was secured by Premises C and a mortgage deed was recorded at the Hillsborough County Registry of Deeds in Book 2188 on Page 0147 on June 27, 2005.

97. The first payment was due to MAK the day after execution of the loan documents.

98. However, MAK insisted on Consumer C paying $300 more than what Consumer C originally agreed.  Consumer C paid MAK $1,816.22 at that time.

99. From August to November 2005, Consumer C paid $1,516.22 a month directly to MAK.

100. However, MAK failed to forward the payments to Novastar in a timely manner.

101. Once Consumer C discovered MAK failed to forward the Novastar payments in atimely manner Consumer C felt she had no choice but to start paying

1    Novastar directly and give MAK the $300 interest payment. per month

2    separately.

3    102.   The above referenced modification took place beginning in December 2005

4    and ended in March 2006.

5    103.   Once Consumer C began sending her first mortgage payments directly to

6    Novastar, Mr. Colsia became verbally threatening and abusive.

7    104.   Mr. Colsia insisted that he was paying the Novastar mortgage; however,

8    Consumer C confirmed with Novastar that Mr. Colsia's statement was not

9    true.

10   105.   MAK sent Consumer C a bill for the amount of the Novastar mortgage

11   payments that Consumer C did not send directly to MAK.  It is unclear if

12   no payments were made or if the payments were simply late.

13   106.   Also of concern for Consumer C was MAK's requirement that payment be made

14   either in cash or cashier's check.

15   107.   Most months Consumer C made her payments in person at MAK's request, or

16   MAK would suggest the money be left hidden at Premises C for Mr. Colsia

17   to pick up.

18   108.   Consumer C refinanced their mortgage on April 26, 2006 in order to

19   payoff the MAK and Novastar mortgages.

20   109.   Consumer C's new mortgage broker requested a payoff statement from Mr.

21   Colsia, as the managing member of MAK.

22   110.   Mr. Colsia's payoff statement was $18,000, which was contrary to the

23   amount contained in the note.

24   111.   Mr. Colsia informed the new mortgage company that the $18,000 figure was

25   "inclusive of all principal, interest, prepaids, and penalties."  MAK

provided no further explanation.

112.   The second mortgage granted to MAK was discharged and said discharge was recorded in the County Registry in Book 2293 on Page 0908 on May 2, 2006.

II.   The staff of the Banking Department, State of New Hampshire alleges the following issues of law:

Chapter 397-A Mortgage Banking and Brokering

1. The Department incorporates by reference and realleged herein paragraphs 1 to 112.

2. The Department has jurisdiction over the licensing and regulation of persons engaged in mortgage banker / broker activities pursuant to New Hampshire RSA 397-A:3.

3. RSA 397-A:3 requires any person not exempt under RSA 397-A:4 that, in its own name or on behalf of other persons, engages in the business of making or brokering residential mortgage loans secured by real property located in this state shall be required to obtain a license from the banking department.  MAK violated this law by offering mortgage loans secured by single family New Hampshire real estate to Consumers A, B and C without a license.

4. Pursuant to NH RSA 397-A:18, the Department has the power to issue and to serve an order requiring persons to cease and desist from violations of the chapter whenever it has reasonable cause to believe that any person has engaged in any act or practice constituting a violation of the banking laws, or any rule or order thereunder.  Respondent has violated RSA 397-A:3 by conducting unlicensed mortgage banker / broker activities in New Hampshire.  Based on the Consumer information provided and the similar Registry of Deeds entries, the Department has reasonable cause to believe that MAK engaged in unlicensed mortgage banking and has

reasonable cause to believe that with out a Cease and Desist Order MAK will continue to violate this law.

5. Pursuant to NH RSA 397-A:17 mortgage bankers/brokers engaging in business in New Hampshire are prohibited from engaging in unethical business practices.  Based on the fact stated about, MAK's changing the terms of the loan from the verbal discussion to the time it was reduced to a promissory note and other actions as set forth in Section I are sufficient to constitute unethical business practices.

## Chapter 398-A - Second Mortgage Loans

1. The Department incorporates by reference and realleged herein paragraphs 1 to 112.

2. The Department has jurisdiction over the licensing and regulation of persons engaged in second mortgage banker / broker activities pursuant to NH RSA 398-A:1-a.

3. Prior to September 2005 RSA 398-A:1-a required that any person engaged in the business of making or brokering second mortgage loans secured by real property located in the state of New Hampshire, which is or shall be occupied in whole or in part as a primary domicile or place of residence by the borrower and which consist of not more than 4 living units, unless the person first obtains a license as provided by in the Chapter, except when the person lending money is the seller of the real estate upon which the second mortgage is to be taken as security. Based on the facts stated above MAK violated this section of the law by making subordinate lien mortgage loans on single family homes located in New Hampshire without a license.

4. Pursuant to NH RSA 398-A:1-b VI the Department has the power to issue and to serve an order requiring persons to cease and desist from violations of the chapter whenever it has reasonable cause to believe that any person has engaged in any act or practice constituting a

Cease and Desist Order - 18

violation of the banking laws, or any rule or order thereunder. Respondent has violated RSA 398-A:1-a by conducting unlicensed second mortgage banker / broker activities in New Hampshire prior to September 4, 2005.  Based on the facts stated in Section I the Department has reasonable cause to believe that MAK violated this provision by making mortgage loans to Consumer A and Consumer C and holding the deed as security for repayment of that loan.

5. Pursuant to NH RSA 398-A:1-b(I)(j) mortgage bankers/brokers engaging in business in New Hampshire are prohibited from engaging in unethical business practices.. Based on the facts stated above, MAK's changing the terms of the loan from the verbal discussion to the time it was reduced to a promissory note is sufficient to constitute an unethical business practice.

**Chapter 399-D - Debt Adjuster**

1. The Department incorporates by reference and realleged herein paragraphs 1 to 112.

2. The Department has jurisdiction over the licensing and regulation of persons engaged in debt adjustment activities with New Hampshire consumers pursuant to NH RSA 399-D:3.

3. RSA 399-D:3 requires any person not exempt under RSA 399-D:4 that engages in the business of debt adjustment with New Hampshire consumers is required to obtain a license from the banking department.. MAK violated this provision by requiring consumers to make their first mortgage payments directly to MAK with the condition that MAK would forward the payment on to the first mortgage company without a debt adjuster license.

4. Pursuant to NH RSA 399-D:23 II the Department has the power to issue and to serve an order requiring persons to cease and desist from violations

of the chapter whenever it has reasonable cause to believe that any person has engaged in any act or practice constituting a violation of the banking laws, or any rule or order thereunder.  Respondent has violated RSA 399-D:3 by conducting unlicensed debt adjustment activities in New Hampshire.  Based on the above facts the Department has reasonable cause to believe that MAK has violated and will continue to violate this provision by receiving for compensation and as agent of debtors, debtors' money for the purposes of distributing money to creditors in full or partial payment of obligations of the debtor.

5. Pursuant to NH RSA 399-D:13 I(j) debt adjusters engaging in business in New Hampshire are prohibited from engaging in unethical business practices.  This section was violated by MAK taking debtor's funds and failing to forward them to the creditor in a timely manner.

## RELIEF REQUESTED

The staff of the Banking Department requests the Commissioner take the following action:

1. Find as fact the allegations contained in section I of the Statement of Allegations of this petition.

2. Make conclusions of law relative to the allegations contained in section II of the Statement of Allegations of this petition.

3. Pursuant to New Hampshire RSA 397-A:18, RSA 398-A:1-b IV, and RSA 399-D:23 II, immediately Order Respondent to Cease and Desist from violations of the New Hampshire Banking Laws.

4. Take such other administrative and legal actions as are necessary for enforcement of the New Hampshire Banking laws, the protection of New Hampshire citizens, and to provide other equitable relief.

**RIGHT TO AMEND**

The Department reserves the right to amend this Petition for Relief and to request that the Banking Department Commissioner take additional administrative action.   Nothing herein shall preclude the Department from bringing additional enforcement action under RSA 397-A, RSA 398-A or RSA 399-D or the regulations thereunder.

Respectfully submitted by:

_____/S/_____          _____7/6/06_____
Andrea J. Shaw                              Date
Staff Attorney

STATE OF NEW HAMPSHIRE BANKING DEPARTMENT

|  |  |
|---|---|
| In re the Matter of:                          ) | |
|                                               ) | |
| State of New Hampshire Banking                ) | Case No.:  06-087 |
| Department,                                   ) | |
|                                               ) | |
|              Petitioner,                      ) | |
|                                               ) | |
|       v.                                      ) | |
|                                               ) | |
| MAK Investments, Brian Colsia,                ) | |
| Gabe Cohen, and Laura Cohen,                  ) | |
|                                               )      ) | |
|              Respondents.                     )  | |

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT is made this 19th day of November, 2007 by and

between the State of New Hampshire Banking Department ("Department"),  MAK

Investments, Brian Colsia, Gabe Cohen and Laura Cohen ("Respondents") and

Joseph Gallagher.

WITNESSETH:

WHEREAS, on or about July 7, 2006 the Department commenced this petition

by a Staff Petition and amended the petition on November 15, 2006 for, among other

reasons, to add a consumer designated as "Consumer E" who is Joseph Gallagher

(hereinafter the "Consumer"); and

WHEREAS, the Respondents timely objected to the entry of a cease and

desist order and indicated they would contest the petition on a variety of grounds;

WHEREAS, thereafter, the Respondents and the Department met to discuss a resolution of the matter which discussions resulted in the execution and entry of a Consent Decree which was signed by the Commissioner on May 16, 2007 (the "Decree");

WHEREAS, pursuant to the terms of the Decree, all matters were resolved other than a determination of whether any restitution should be paid to the Consumer;

WHEREAS,  pursuant to the terms of the Decree the parties held the first day of a hearing to determine whether any restitution was to be awarded to the Consumer on August 29, 2007; and

WHEREAS, following the first day of hearings the Respondents and the Consumer entered into settlement discussions.

NOW THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, the parties agree as follows:

1. <u>Payment of Restitution.</u>   Within five (5) days of the entry of an order by the Commissioner approving this Settlement Agreement the Respondents shall pay the Consumer twenty-five thousand dollars ($25,000) (the "Payment").  The Payment shall represent the complete and final resolution of, and discharge of any basis for any further civil or administrative proceeding by the Department against the Respondents for any violations arising as a result of or in connection with actions or omissions by the Respondents through the date of this Order as to the Consumer. With the entry of the order approving this Settlement Agreement and the Consent Decree entered May 16, 2007

the above-captioned matter shall be concluded by the Department and closed.

2. Releases.   Consumer for and in consideration of the Payment,  and other valuable consideration received from the Respondents, the receipt of which is hereby acknowledged, does hereby remise, release, acquit, satisfy, and forever discharge the said Respondents, of and from all manner of actions, causes of action, suits, debts, covenants, contracts, controversies, agreements, promises, claims and demands whatsoever, which Consumer ever had, now has, or which Consumer or any personal representative, successor, heir or assign of Consumer, hereafter can, shall or may have, against Respondents, by reason of any matter, cause or thing whatsoever, from the beginning of time to the date of this instrument, including, but not by way of limitation, relating in any way whatsoever to any of the claims, action or causes of action raised or that could have been raised in the Staff Petition concerning Consumer, Respondents and the 22 West Chamberlain, Merrimack, New Hampshire property or in any proceedings relating thereto.

**WHEREFORE**, based on the foregoing, we have set our hands to this Agreement, with it taking effect upon the signature of Peter C. Hildreth, Bank Commissioner.

- 3 -

MAK INVESTMENTS, BRIAN COLSIA, GABE
COHEN AND LAURA COHEN

By their attorneys,

McLANE, GRAF, RAULERSON &
MIDDLETON,
PROFESSIONAL ASSOCIATION

By: _____/S/_____
      Wilbur A. Glahn, III
      Joseph A. Foster
      900 Elm Street, P.O. Box 326
      Manchester, NH 03105
      Telephone (603) 625-6464


_____/S/_____

James Shepard, Staff Attorney,
New Hampshire Banking Department


_____/S/_____

JOSEPH GALLAGHER, Individually

    and

by his attorney

_____/S/_____
Peter S. Wright
Franklin Pierce Law Center
2 White Street
Concord, N.H. 03301


Entered this 29th day of November, 2007.

_____/S/_____
Peter C. Hildreth,
Bank Commissioner

- 4 -

2006 BNH 029      Note:  This is an unreported opinion.  Refer to AO 1050-1 regarding citation.

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                    Bk. No. 05-12604-JMD
                                                          Chapter 7
Donald V. Drew, Jr.,
                    Debtor


Timothy P. Smith,
Chapter 7 Trustee,
                    Plaintiff


v.                                                        Adv. No. 05-1137-JMD


MAK Investments, LLC, and
Brian Colsia,
                    Defendants


*Peter S. Wright, Jr., Esq.*
*Franklin Pierce Law Center*
*Attorney for Plaintiff*
*Concord, New Hampshire*

*Grenville Clark III, Esq.*
*Gray, Wendell & Clark, P.C.*
*Attorney for Defendants*
*Manchester, New Hampshire*


## MEMORANDUM OPINION

## I. INTRODUCTION

Timothy Smith, the Chapter 7 Trustee (the "Trustee"), brought suit against MAK

Investments, LLC ("MAK") and Brian Colsia ("Colsia"), the managing member of MAK

(collectively the "Defendants"), seeking to avoid the transfer of the Debtor's residence to MAK

under the Bankruptcy Code and to collect damages pursuant to state law and the common law (the "Complaint").  In Count I of the Complaint, the Trustee seeks to avoid the transfer of the Debtor's residence to MAK as a fraudulent transfer under 11 U.S.C. § 548(a)(1).  In Count II, the Trustee seeks double or treble damages plus fees and costs pursuant to New Hampshire Rev. Stat. Ann. ("NH RSA") 358-A, the New Hampshire Consumer Protection Act (the "CPA").  In Count III, the Trustee seeks an award for the damages caused by MAK's tortious interference with contracts, pursuant to the common law.  In Count IV, the Trustee seeks the actual damages caused by MAK defrauding the Debtor, pursuant to the common law.  Finally, the Trustee seeks a determination that Colsia is personally liable for the claims set out in Counts I through IV because he used a limited liability company to perpetrate injustice or fraud.  The Defendants filed a counterclaim for breach of contract, for which it seeks damages.

On May 11, 2006, the Court held a one-day trial, during which the Trustee withdrew the tortious interference claim.  At the close of the trial, the parties agreed to submit post-trial memoranda of law and the Court took the matter under advisement.  This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. BACKGROUND

### A. Undisputed Facts

This is an action to avoid a prepetition transfer made by the Debtor to MAK and for damages under state law.  The property that was transferred consisted of the Debtor's residence

of twenty-two years ("Residence").  The following facts are uncontested.  The Debtor and Colsia

met for the first time on May 14, 2005 (the "Transaction Date"), when Colsia rang the Debtor's

doorbell to discuss helping the Debtor "save his house" from a pending foreclosure.  On the

same day, the parties executed a Sales Agreement and Deposit Receipt (the "Sales Agreement")

in which the Debtor agreed to convey title to the Residence on or before May 14, 2005, to MAK

by warranty deed, while MAK agreed to pay the foreclosing attorney's office $18,997.90[1], pay

off the first mortgage and late fees, and cover all closing costs (collectively the "Transaction").

The Sales Agreement included an Additional Provisions Addendum (the "Addendum"), which

obligated MAK to honor an exclusive purchase and sales agreement between the Debtor and an

identified buyer, Joseph Courtney ("Courtney"), by obligating MAK to deliver a deed to

Courtney on or before June 30, 2005, in exchange for the Debtor reimbursing MAK for all costs

related to the Transaction plus a $25,000.00 fee.  The Addendum also called for the Debtor to

vacate the Residence on June 30, 2005, with no further recourse, if the sale to Courtney did not

close.  The Sales Agreement, with the attached Addendum, was fully executed and notarized in

the Residence on the Transaction Date.  On the same day, the Debtor signed a warranty deed (the

"Deed") granting MAK title to the Residence, which MAK recorded on May 16, 2005.

   Prior to the Transaction Date, the Debtor had listed the Residence with a real estate

broker (the "Broker") who received an offer to purchase the Residence that did not go through.

The offer to purchase from Courtney, a second prospective buyer, was pending as of the

Transaction Date.  Sometime thereafter the deal with Courtney also fell through.  The Debtor

responded by asking the Broker to continue to try to sell the Residence, and the Broker found a new

buyer.  On June 11, 2005, the Debtor sent a fax to Colsia requesting that the he substitute the

---

[1]  The Court notes that this amount coincides with the amount needed to reinstate the mortgage.

new buyer for Courtney so he could sell the Residence rather than be rendered homeless as of June 30, 2005. The Debtor ceased his efforts to sell after he learned a new buyer could not be substituted.

As of the Transaction Date, the Residence had an approximate value of $164,750.00.[2] The Debtor filed his Chapter 7 bankruptcy petition on June 30, 2005, the date specified in the Addendum for the Debtor to vacate the Residence. To date, the Debtor has not vacated the Residence. Neither party has paid any money directly to the other party. The balance on the Debtor's mortgage remains unpaid.

### B. Disputed Issues

The Trustee asserts the Transaction was a fraudulent transfer pursuant to § 548(a)(1) because the Debtor did not receive "reasonably equivalent value" when he transferred title to the Residence, valued at $164,750.00, in consideration for MAK paying the foreclosing attorney's office $18,997.90 (the "Reinstatement Payment"). The Defendants counter that the Debtor received additional compensation because the Addendum reserved the right for the Debtor to sell the Residence to Courtney, if the Debtor had been able to close that sale; the Debtor's credit was "saved" by the mortgage being reinstated and the foreclosure being stopped; and MAK incurred additional expenses related to the Transaction that amounted to $12,372.95[3] (the "Additional Expenses"). Accordingly, one issue before the Court is whether the Reinstatement Payment plus

---

[2] The Trustee's appraiser valued the Residence at $167,000.00 as of June 30, 2005, while the Defendants' appraiser valued it at $162,500.00 as of April 21, 2006. The Defendants' appraiser testified that these two values are consistent with each other. Accordingly, the Court shall consider the value to be the average of the appraisers' values, or $164,750.00.

[3] MAK made $8,575.66 in post-Transaction expenditures, which include: tax stamps ($1,200.00), recording fees ($17.37), legal fees ($5,610.89), eviction-related costs ($197.40), insurance ($750.00), and an appraisal ($800.00). Additionally, MAK has paid $3,797.29 toward interest and principal on the mortgage.

4

the Additional Expenses (collectively the "Cumulative Consideration") amounted to reasonably equivalent value pursuant to § 548(a)(1).

The Trustee also asserts that he is entitled to double or triple statutory damages under the CPA because Colsia perpetrated an unfair or deceptive act by promoting the Transaction to the distraught Debtor as a refinancing arrangement rather than an outright sale with an option to resell to a particular buyer and, thereby, misrepresenting the nature of the Transaction. The Defendants counter that Colsia made it "clear as a bell" that the Transaction was an outright purchase of the Residence. Accordingly, the second issue before the Court is whether the circumstances that led to the culmination of the Transaction amounted to an unfair or deceptive act under state law and, if so, what the Trustee's damage award will be.

Finally, the Trustee asserts he is entitled to the actual damages caused by Colsia's fraudulent conduct, under common law fraud. The Defendants denied the allegation and reasserted their response to the CPA claim. Accordingly, the Court must determine if Colsia's conduct at the Transaction was fraudulent under New Hampshire common law.

The Defendants filed a counterclaim asserting that MAK is entitled to an award of damages for the losses caused by the Debtor's failure to vacate the Residence. The Trustee did not respond to the counterclaim either by answer or at the trial. The final issue before the Court is whether the MAK is entitled to damages due to the Debtor's breach of contract and, if so, what the Defendants' damage award will be.

5

## III. DISCUSSION

### A. Fraudulent Transfers and Reasonably Equivalent Value

#### 1. The Law

Section 548, the fraudulent transfer provision of the Bankruptcy Code, "allows the trustee to avoid a transaction made within one year before the commencement of the bankruptcy case, that depletes the debtor's assets to the detriment of the bankruptcy estate." Collier on Bankruptcy ¶ 548.01 (15th rev. ed. 1998). "Transfers . . . that are deemed to be constructively fraudulent, because they are made for less than reasonably equivalent value, when the debtor is, or is rendered, insolvent, undercapitalized, or unable to pay its debts as they become due" are recognized as fraudulent under the statute. Id. The relevant part of this statutory provision reads as follows:

> § 548 Fraudulent transfers and obligations.
>
> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> * * * *
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > (B)(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . . .

11 U.S.C. § 548(a)(1). Accordingly, the elements of a fraudulent conveyance under § 548 are: (1) a "transfer" of an interest of the debtor, (2) made within one year of the date of filing of the petition, (3) for less than a reasonably equivalent value, (4) while the debtor was insolvent, or that rendered him insolvent.

6

The parties agree that a transfer[4] of the Debtor's property occurred six weeks before the Debtor filed for bankruptcy protection, and that the Debtor's inability to pay his debts as they became due was demonstrated by the impending foreclosure on the Residence. Accordingly, the Court finds that three of the four elements have been met. Therefore, for the Trustee to prevail under Count I, he has the burden of proving by the preponderance of the evidence that the Debtor received less than reasonably equivalent value in the Transaction. Dahar v. Jackson (In re Jackson), 318 B.R. 5, 23 (Bankr. D.N.H. 2004).

Whether reasonably equivalent value has been given in a transaction is dependant on all the circumstances surrounding the transaction and is largely a question of fact. Collier on Bankruptcy, supra, at ¶ 548.05. Accordingly, the trier of fact is given considerable latitude in making this determination. Id. In this district, the determination of reasonably equivalent value under § 548 in a pre-foreclosure conveyance requires "a flexible approach that takes into account all aspects of the foreclosure sale" because the statute "requires a federal determination of reasonably equivalent value." In re Nat'l Envtl. Sys. Corp., 111 B.R. 4, 28 and 17 (Bankr. D.N.H. 1989). Since National Environmental was decided, the United States Supreme Court has held that real property transfers by insolvent debtors that occur within one year prior to filing a bankruptcy petition are conclusively made in exchange for reasonably equivalent value within the meaning of the Bankruptcy Code if the consideration is obtained from a non-collusive foreclosure sale conducted in conformance with applicable state law. BFP v. Resolution Trust Corp., 511 U.S. 531 (1994). However, the BFP Court emphasized that its holding "cover[s] only

---

[4] The Code defines the term "transfer" to be "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(58).

mortgage foreclosures of real estate," id. at 564 n.5, and noted that "the 'reasonably equivalent

value' criterion will continue to have independent meaning (ordinarily a meaning similar to fair

market value) outside the foreclosure context." Id. at 545.  Accordingly, the Court finds that a

flexible approach to a § 548 reasonably equivalent value determination, similar to the one used

in National Environmental, remains appropriate for determination of reasonably equivalent value

for voluntary pre-foreclosure transfers in New Hampshire.

The National Environmental Court articulated factors that should be considered on a

case-by-case basis when determining reasonably equivalent value, which include:  "the disparity

between the price and the net market value, efforts to stimulate competitive bidding, the extent

of advertising, whether an outside appraisal should have been obtained, and whether notice to

local brokers would have been effective at promoting the sale." Nat'l Envtl., 111 B.R. at 20.

Although some of the factors articulated in National Environmental would apply only in a

foreclosure situation, the general approach to determination of reasonably equivalent value does

apply to voluntary transfers shortly before a foreclosure sale.  The Trustee argues he is entitled to

prevail under a National Environmental factor analysis because:  (1) the disparity between the

market value ($164,750.00) and the Reinstatement Cost expended ($18,997.00) is large

($145,753.00); (2) even if the Additional Expenses ($12,374.00) are included, the disparity

remains substantial ($133,379.00); and (3) the finality of the transfer foreclosed the opportunity

for the Debtor to close the sale with any potential buyer other than Courtney, thereby prohibiting

competitive sales activities.  The Defendants also cited National Environmental in support of

their general assertion that the Cumulative Consideration resulted in reasonably equivalent value

but did not provide any analysis or valuation for the Cumulative Consideration.

8

Colsia testified he had a rough sense of the value of the property before he approached the Debtor on the Transaction Date.  He also testified that he covered all expenses pertaining to the transfer and that he paid $1,200.00 in transfer taxes, which equates to a valuation of $80,000.00,[5] less than one half of the value established by the evidence at trial.  No evidence or argument was offered at trial regarding how the consideration for the transfer was computed.  Under the Sales Agreement, the transferee assumed and agreed to pay the first mortgage on the Residence.  Assumption of a mortgage by a transferee is consideration for purposes of computing the real estate transfer tax.  NH RSA 78-B:1-a(IV).  The Debtor's schedules reflect a balance due on his mortgage of $53,149.00.  When added to the Reinstatement Cost ($18,997.00) and the Additional Expenses ($12,374.00), the total ($84,520.00) is consistent with the amount of consideration declared by the transferee when it recorded the deed from the Debtor.  Accordingly, based upon the evidence at trial, and the declaration to the State of New Hampshire when the deed of the Residence was recorded, the Court finds that the consideration for the transfer of the Residence was $80,000.00 or forty-nine percent of the opinion of fair market value offered by the Defendants' own appraiser at trial.  Consideration in the amount of forty-nine percent of fair value paid by a knowledgeable real estate investor is not reasonably equivalent value.  Accordingly, the Court finds the Trustee has established that the Transaction was a fraudulent transfer and thus is avoided under § 548(a).

---

[5]  According to New Hampshire law, both the buyer and the seller are responsible for paying $.75 per $100 of the price or consideration paid upon the transfer of real property.  RSA 78-B:1 and 4. Because the Defendants covered both the buyer's and the seller's costs, the payment of $1,200.00 in transfer taxes equates to a valuation of the consideration at $80,000.00.

9

## 2. The Remedy

If a transfer is avoided under § 548, the Trustee may recover either the property or the value of the property. 11 U.S.C. § 550(a). Section 550(a) provides in relevant part that:

> the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from–
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . .

Id. Because the Trustee has prevailed on his claim that the Transaction violated § 548(a), the Transaction is void. Accordingly, the Trustee may recover title to the Residence, or the value thereof, for the benefit of the estate.

Section 548(c), however, entitles a good faith transferee for value to a replacement lien to the extent of the value given for the interest in property that has been avoided. 11 U.S.C. § 548(c). Section 548(c) provides:

> (c) . . . a transferee or obligee . . . that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Id. Accordingly, to be entitled to a replacement lien pursuant to § 548(c), a transferee must: (1) have given value for the transfer and (2) have acted in good faith.

### (a) Value

Section 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of debtor, but does not include an unperformed promise to furnish support to the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Thus it the value element of the lien replacement test differs from the value requirement in § 548(a) because § 548(d)(2)(A) does not

sufficient for the Court to determine the amount MAK paid toward principal on the mortgage, the real estate taxes and the amount of credit for that portion of the Adequate Protection Payments made by the Debtor that are allocable to such principal payments and real estate taxes. Accordingly, the Court shall order MAK to file a financial accounting regarding these expenditures.

### B. Unfair or Deceptive Acts

In Count II, the Trustee asserts the Defendants violated NH RSA 358-A, the New Hampshire Consumer Protection Act. The CPA, which generally proscribes unfair or deceptive trade practices and delineates specific types of conduct that qualify as unfair or deceptive trade practices, provides in relevant part:

> It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following . . . .

RSA 358-A:2 (1999 & Supp. 2003).

Although the general provision of the CPA is broadly worded, the New Hampshire Supreme Court has recognized that some conduct in the course of trade or commerce falls outside its scope. Barrows v. Boles, 141 N.H. 382, 390 (1996). The New Hampshire Supreme Court employs the "rascality test" from Barrows to determine which commercial actions, not specifically delineated, are covered by the CPA. See Milford Lumber Co. v. RCB Realty, 147 N.H. 15, 17 (2001). Under the rascality test, "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. To prevail under the CPA the Trustee has the burden of proving, by the

preponderance of the evidence, that the Defendants' actions were unfair or deceptive to the degree defined in the <u>Barrows</u> rascality test.

The Trustee did not provide any evidence the Transaction was unfair. In fact, the Debtor testified that he understood and agreed to the essential elements of the Transaction – that by June 30, 2005, he had to sell the Residence or he would have to move out that day and reimburse the Defendants for the money spent on his behalf plus a $25,000.00 fee. Because the Debtor understood and willingly entered into this deal, the Court does not find that the Transaction was unfair.

The Trustee, however, did claim that Colsia's behavior on the Transaction Date was deceptive as well as unethical, oppressive, or unscrupulous. In particular, the Trustee asserted that Colsia took unfair advantage of the Debtor when he was "frantic, distraught, and overwhelmed" by mischaracterizing the Transaction as a refinancing to "save" the Debtor's residence and leading the Debtor to believe he was merely granting Colsia a lien on his residence. The Defendants deny that Colsia mischaracterized the transaction and counter that he made the nature of the Transaction crystal clear at all times. This diametrically opposed testimony is a classic case of "He said; I said" from which the Court cannot determine what actually transpired on the Transaction Date.

While the Court recognizes that a lay person might confuse the word "reinstate" for "refinance," the evidence presented at trial supports the Defendants' characterization of what transpired that day. In particular, the fact that the Debtor signed a document that was clearly captioned as a Sales Agreement, after having had previously signed two Sales Agreements with prospective buyers, belies his assertion that the documentation was misleading. Furthermore, the

14

Sales Agreement did not contain any repayment terms and even if the Debtor thought it was a refinancing deal, he understood that any such option would cease on June 30, 2005, if he was unable to close the sale to Courtney.  Additionally, the Debtor sent Colsia a letter on June 11, 2005, requesting the right to substitute another buyer for Courtney so he would not be rendered "homeless" on June 30.  This letter is a clear admission the Debtor understood he would lose all rights in the Residence as of June 30, 2005.  Finally, the Debtor had the opportunity to think about what he was doing before he signed the Sales Agreement and Deed.  Undisputed testimony establishes that 1-1/2 hour lapsed between when the Colsia and the Debtor hand drafted their understanding and when Colsia returned with a notary and the form documents, which he reviewed with the Debtor before the Debtor signed them.  This evidence taken as a whole indicates that, while there may have been some confusion as to terminology, the Debtor was not deceived about the ultimate terms of the deal.  The Court finds the Trustee failed to prove by a preponderance of the evidence that Colsia's actions were in violation of the CPA.  Accordingly, the Trustee shall be denied recovery under his claim that the Defendants violated the CPA.

### C.  Common Law Fraud

To establish a claim of common law fraud, a plaintiff must prove by clear and convincing evidence that "the defendant made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely on it," and the reliance must be justifiable.  Sanderson v. Scrutin, 145 N.H. 73, 77 (2000).  For the reasons stated in the previous section, the Court finds the Trustee has not met his burden of proof on the common law fraud count.  Accordingly, the Trustee shall be denied recovery under his claim of common law fraud.

### D. Colsia's Personal Liability

To prevail on a claim that Colsia is personally liable, the Trustee would have to have proven the elements required to pierce the corporate veil. No evidence was presented on this issue. Accordingly, the Court finds that Colsia is not personally liable.

### E. Damage to MAK Caused by Debtor's Breach

MAK filed a counterclaim against the Trustee asserting the Debtor's failure to vacate the Residence on June 30, 2005, was a breach of his obligations under the Sales Agreement and claiming it was due an award for the damages caused by the breach. Because the Court has found that the Transaction was a fraudulent transfer that is avoided under § 548(a), the Debtor's obligations under the Sales Contract are avoided. Accordingly, the Court finds the Debtor did not breach the Sales Agreement and, therefore, MAK shall be denied recovery under its counterclaim for breach of contract. Any quantum meruit claim by MAK is more than covered by that portion of the Adequate Protection Payments not attributed to mortgage principal and real estate tax payments.

## IV. CONCLUSION

For the reasons stated above, the Court concludes the Transaction is avoidable pursuant to 11 U.S.C. § 548(a)(1). The Court, therefore, concludes the Adequate Protection Order and the Order Granting Relief from Stay entered in the main case should be vacated. Accordingly, the Court shall issue a separate order in the main case vacating the Adequate Protection Order and the Stay Relief Order. The Court further concludes that MAK is entitled to a lien against the Residence, in an amount yet to be determined, for the portion of the Cumulative Consideration

16

that paid the direct obligations of the Debtor that were not covered by the Debtor's Adequate

Protection Payments.  Accordingly, the Court shall issue a separate order requiring MAK to file

an accounting of all principal and real estate taxes paid by the Defendants and the Debtor.  After

consideration of the accounting, the Court will enter a separate judgment:

1.  In favor of the Trustee and against the Defendants based upon the transfer of the
    Residence being constructively fraudulent under 11 U.S.C. § 548(a)(1).

2.  In favor of the Defendants and against the Trustee for all claims based on
    NH RSA 358-A and common law fraud.

3.  In favor of MAK granting a lien on the Residence pursuant to 11 U.S.C. §
    548(c) in an amount to be determined by the Court in accordance with this
    opinion.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance

with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment

consistent with this opinion.

ENTERED at Manchester, New Hampshire.

Date:   August 17, 2006                    /s/ J. Michael Deasy
                                           J. Michael Deasy
                                           Bankruptcy Judge





# CONCORD MONITOR
Thursday, April 2, 2008
The news you need now



Purchase photo reprints at PhotoExtra!

totalSEARCH  All                    Find It  Archive search                  Subscribe | Newsletter | Place an ad | Contact us

Livewell
Spring 2009
New Hampshire

**Top Jobs**

INFRASTRUCTURE MANAGER
CHESHIRE MEDICAL CENTER

View all Top Jobs

**Home**
**Login**
Create account
Forgot password
**News**
Local headlines
Obituaries
Town by town
Politics
New England
Nation-World
We Went To War
Business
Associated Press
Concord insider
Podcasts
RSS Feeds
**Sports**
High schools
Professional
College
Racing
**Opinion**
Editorials
Letters
Columns
Write a letter
**Blogs**
BlogsNH
Primary Monitor
**Photography**
"Pulitzer Winner"
PhotoExtra
Multimedia
Anthrozoology
Primary Circus
Teen Life
Web Cam
**Marketplace**
Classifieds
Jobs
Cars
Homes
Corner Cupboard
Yellow Pages
Monitor Openings
Place an ad
Best of 2008
**Community**
Town by town
Couples
Wedding Guide
Obituaries
Personals
**Entertainment**
Dining Deals
Books
Movies
Music
Tuned In
**Living**
Food
Health
Home-Family
Beliefs
Travel
**Newspaper**
Subscriptions
Advertising
Commercial Jobs
Contact us
Directions
History
**Online**
Newsletter
Archives
Help
Advertise Online
Our Advertisers
About us
Contact us

**Special Sections**

DRAFT Your Neighborhood Sports Bar with a Menu full of Home Cooked Food DRAFT

## Predatory lenders
**A growing fear of foreclosure has led many to lose their property to mortgage 'rescuers'**

Font size: A  A  A
🖨 Print article
✉ Letter to editor
📨 Send and share

**BY LISA ARSENAULT**
Monitor staff

February 16, 2007 - 4:59 pm

Karl Comtois and his wife April thought they were signing a deal two years ago that would save their Manchester home from foreclosure. What they didn't realize, Comtois says, is that they were actually signing their house away to an unlicensed mortgage lender they have been battling in court ever since.

Comtois hopes he won't have to find a new home for his wife and five young children, but the company - called MAK Investments - now holds the deed to his property. Unless a court or the state banking commissioner rules the deal void because the company didn't follow proper lending procedures, Comtois will likely be evicted from his two-story colonial on the outskirts of the city.

"Dealing with this is like having another job," said Comtois, 31. "It's really hard on the family."

MAK Investments says it didn't do anything wrong. The company is trying to help homeowners facing foreclosure who don't have good enough credit to get traditional refinancing, said manager Brian Coisia. The theory, he said, is that once homeowners get the initial boost from MAK to stop the foreclosure, they are then able to turn their finances around and pay back what they owe.

"I am their only savior in that situation," Coisia said. "I've had success stories. I've had people who turned it around."

Consumer advocates and state regulators have a different view of foreclosure rescue deals. They say Comtois is one of a growing number of homeowners in New Hampshire who have sunk deeper into financial trouble by signing a last-minute agreement with a company that promised to help beat foreclosure. As the number of foreclosures has risen steadily in the past year, so has the number of deals aimed at taking advantage of consumers desperate to hang onto their homes, they say.

"Just as the housing market goes up and down, the rate of foreclosures goes up and down, and these kinds of operations swoop into states trying to rip people off," said Sarah Mattson, a staff attorney with New Hampshire Legal Assistance who has seen a spike in the number of foreclosure scam cases in the past year. "It's a risky situation when you factor in that the people facing foreclosure are really desperate to stay in their homes, so it's easy to fall for this."

The companies make lists of homeowners facing foreclosures based on auction notices in newspapers and then approach the homeowners in person with a high-interest loan, promises of services that are unnecessary or never delivered, or other tricks to convince the homeowner to sign over the title to their property, Mattson said.

In some cases, the companies use unfair and unlawful trade practices to scam homeowners who are desperate to hang onto their homes, Mattson said. In other cases, the companies don't break the law - they just offer homeowners a deal they would be better off not taking, she added. The bottom line is that homeowners facing foreclosure need to be wary of predatory lending practices and deals that sound too good to be true - particularly if the deal involves signing over the deed to their home.

"Once you sign a deed to your property and give it to someone else, they own your property," she said. "That's a really risky situation to put yourself in, even when you're facing foreclosure. There may be other options."

**A consumer's nightmare**

Karl Comtois, a building subcontractor, fell behind on his mortgage payments in the summer of 2005 after contractors for two big jobs failed to pay him for the work he did.

Roughly three weeks before his looming foreclosure that July, an employee of MAK Investments knocked on his door. He says he got trapped in every consumer's worst nightmare: The paperwork he signed to get himself out of a mess was not the deal he thought he was getting.

The company offered to pay what he owed his mortgage company to stop the foreclosure and help Comtois get back on his feet. Under the terms of the deal, Comtois would make monthly payments totaling the $24,000 MAK loaned him to pay his mortgage company. At the end of the year, he would also owe MAK another $24,000 for helping him out.

**Related articles:**

Family's story has larger implications (1/3/2007)


Look for March 20
Livewell


Lovable mug.
Monitor Reprints

Internet access services provided by

1-800-662-6568


**NEWSPAPERS IN EDUCATION**
Concord Monitor can deliver free newspapers to your local school's classrooms. Find out how.





For security on the loan, MAK required Comtois to sign a warranty deed for the property, and if he was more than five days late on any payment in that year or he failed to pay the lump sum at the end, the company would record the deed and take ownership of his property.

Single page | 1 | 2 | 3 | ▶

This article is: 774 days old.

Print article          Letter to editor          Send and share

## Comments

### Post a new comment

Subject:

Message:

Submit

The Concord Monitor provides the opportunity for users to comment on material posted to the site as a way to encourage respectful community dialogue. The Concord Monitor does not screen or monitor user comments and is not responsible for their contents. The Monitor does, however, reserve the right to monitor content if it chooses and to remove comments that include profanity, personal attacks or antisocial behavior such as "spamming," "trolling" or any other inappropriate material at the Monitor's discretion. Please see our Discussion Guidelines.

-->

Subscribe | Advertiser Profiles | Jobs | Autos | Real Estate | Classifieds | Photo Reprints | Contact Us

Copyright 1997-2009
Concord Monitor and New Hampshire Patriot
P.O. Box 1177
Concord NH 03302
603-224-5301
Privacy policy





# CONCORD MONITOR
Friday, March 6, 2009   The news you need now



Purchase photo reprints at PhotoExtra!

totalSEARCH  All    [ Find it ]  Archive search

Subscribe | Newsletter | Place an ad | Contact us

Say 'Good Buy' to Winter
...and save 50% on your home-delivery subscription.



FREE QUOTE

**Dining Deals**

**Home**
Login
Create account
Forgot password

**News**
Local headlines
Obituaries
Town by town
Politics
New England
Nation-World
We Went To War
Business
Associated Press
Concord Insider
Podcasts
RSS Feeds

**Sports**
High schools
Professional
College
Racing

**Opinion**
Editorials
Letters
Columns
Write a letter

**Blogs**
BlogsNH
Primary Monitor

**Photography**
*Pulitzer Winner*
PhotoExtra
Multimedia
Anthrozoology
Primary Circus
Teen Life
Web Cam

**Marketplace**
Classifieds
Jobs
Cars
Homes
Corner Cupboard
Yellow Pages
Monitor Openings
Place an ad
Best of 2008

**Community**
Town by town
Couples
Wedding Guide
Obituaries
Personals

**Entertainment**
Dining Deals
Books
Movies
Music
Tunes In

**Living**
Food
Health
Home-Family
Beliefs
Travel

**Newspaper**
Subscriptions
Advertising
Commercial Jobs
Contact us
Directions
History

**Online**
Newsletter
Archives
Help
Advertise Online
Our Advertisers
About us
Contact us

**Special Sections**

## Predatory lenders
### A growing fear of foreclosure has led many to lose their property to mortgage 'rescuers'

By LISA ARSENAULT
Monitor staff

February 16, 2007 4:56 pm

Karl Comtois and his wife April thought they were signing a deal two years ago that would save their Manchester home from foreclosure. What they didn't realize, Comtois says, is that they were actually signing their house away to an unlicensed mortgage lender they have been battling in court ever since.

Comtois hopes he won't have to find a new home for his wife and five young children, but the company - called MAK Investments - now holds the deed to his property. Unless a court or the state banking commissioner rules the deal void because the company didn't follow proper lending procedures, Comtois will likely be evicted from his two-story colonial on the outskirts of the city.

"Dealing with this is like having another job," said Comtois, 31. "It's really hard on the family."

MAK Investments says it didn't do anything wrong. The company is trying to help homeowners facing foreclosure who don't have good enough credit to get traditional refinancing, said manager Brian Colsia. The theory, he said, is that once homeowners get the initial boost from MAK to stop the foreclosure, they are then able to turn their finances around and pay back what they owe.

"I am their only savior in that situation," Colsia said. "I've had success stories. I've had people who turned it around."

Consumer advocates and state regulators have a different view of foreclosure rescue deals. They say Comtois is one of a growing number of homeowners in New Hampshire who have sunk deeper into financial trouble by signing a last-minute agreement with a company that promised to help beat foreclosure. As the number of foreclosures has risen steadily in the past year, so has the number of deals aimed at taking advantage of consumers desperate to hang onto their homes, they say.

"Just as the housing market goes up and down, the rate of foreclosures goes up and down, and these kinds of operations swoop into states trying to rip people off," said Sarah Mattson, a staff attorney with New Hampshire Legal Assistance who has seen a spike in the number of foreclosure scam cases in the past year. "It's a risky situation when you factor in that the people facing foreclosure are really desperate to stay in their homes, so it's easy to fall for this."

The companies make lists of homeowners facing foreclosures based on auction notices in newspapers and often approach the homeowners in person with a high-interest loan, promises of services that are unnecessary or never delivered, or other tricks to convince the homeowner to sign over the title to their property, Mattson said.

In some cases, the companies use unfair and unlawful trade practices to scam homeowners who are desperate to hang onto their homes, Mattson said. In other cases, the companies don't break the law - they just offer homeowners a deal they would be better off not taking, she added. The bottom line is that homeowners facing foreclosure need to be wary of predatory lending practices and deals that sound too good to be true - particularly if the deal involves signing over the deed to their home.

"Once you sign a deed to your property and give it to someone else, they own your property," she said. "That's a really risky situation to put yourself in, even when you're facing foreclosure. There may be other options."

### A consumer's nightmare

Karl Comtois, a building subcontractor, fell behind on his mortgage payments in the summer of 2005 after contractors for two big jobs failed to pay him for the work he did.

Roughly three weeks before his looming foreclosure that July, an employee of MAK Investments knocked on his door. He says he got trapped in every consumer's worst nightmare: The paperwork he signed to get himself out of a mess was not the deal he thought he was getting.

The company offered to pay what he owed his mortgage company to stop the foreclosure and help Comtois get back on his feet. Under the terms of the ___ ___, Comtois would make monthly payments totaling the $24,000 M___ ___oaned him to pay his mortgage company. At the ___ of the year, he would also owe MAK another $24,000 for helping ___ out.

Related articles:

Family's story has larger implications



CLICK HERE FOR TICKETS
JUNE 24
**BRAD PAISLEY**
DIERKS BENTLEY & JIMMY WAYNE
Meadowbrook
U.S. Cellular Pavilion

Font size A A A
Print article
Letter to editor
Send and share

**Top Jobs**

CONSTRUCTION LAYOUT FOREMAN
P.R. HELEY INC.

AUTO SALES REP
GRAPPONE
SUBARU

BUSINESS ANALYST
CHESHIRE MEDICAL CENTER

View all Top Jobs



Lovable mug.
Monitor Reprints





MONITOR makes history







Communications



**NEWSPAPERS IN EDUCATION**
Concord Monitor can deliver free newspapers to your local school's classrooms. Find out how

**2007 BNH 022**      Note:  This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW HAMPSHIRE

In re:

Karl R. Comtois and
April J. Comtois,
                    Debtors


Karl R. Comtois, April J. Comtois, and
Lawrence P. Sumski, Trustee,
                    Plaintiffs

.v.

MAK Investments, LLC,
                    Defendant

Bk. No. 06-10092-JMD
Chapter 7



Adv. No. 06-1067-JMD

*Peter S. Wright, Esq.*
*Franklin Pierce Law Center*
*Civil Practice Clinic*
*Concord, New Hampshire*
*Attorney for Plaintiffs/Debtors*

*Grenville Clark, III, Esq.*
*Gray, Wendell & Clark, PC*
*Manchester, New Hampshire*
*Attorney for Defendant*

**MEMORANDUM OPINION**

## I.  INTRODUCTION

Karl and April Comtois (the "Debtors") filed a voluntary petition under chapter 13 of the

Bankruptcy Code[1] on February 8, 2006 (the "Petition Date").  The Debtors and Lawrence

---

[1]  Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§" refer to Title 11 of
the United States Code, 11 U.S.C. § 101 et seq., as amended by the Bankruptcy Abuse Prevention and
Consumer Protection Act of 2005, Pub. L. No. 109-8.

Sumski, the chapter 13 trustee (collectively, the "Plaintiffs") commenced this adversary proceeding on March 13, 2006, by filing a complaint against MAK Investments, LLC (the "Defendant"). The Plaintiffs amended the complaint on June 30, 2006 (the "Complaint"). On September 27, 2006, the Plaintiffs filed a motion for partial summary judgment on Counts I, II and V of the Complaint (the "SJ Motion"). After a hearing on November 7, 2006, the Court took the SJ Motion under advisement. On November 10, 2006, the Debtors converted their bankruptcy case to a proceeding under chapter 7 of the Bankruptcy Code. On February 16, 2007, this Court granted the SJ Motion as to liability of the Defendant under Count I (NH RSA 358-K) and Count II (NH RSA 399-B) and denied the SJ Motion as to the remedies and damages under Counts I and II and as to liability under Count V (NH RSA 398-A). On May 7, 2007, the Court conducted a trial on liability under Count III (NH RSA 358-A), Count IV (15 U.S.C. § 1640), Count V (NH RSA 398-A), and the issue of damages under Counts I through V. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS

The Debtors acquired their home in Manchester in 2002 (the "Residence"). In 2005, they became delinquent in the payment of their mortgage to Countrywide Home Loans ("Countrywide"). The original principal balance on the mortgage to Countrywide was $217,600.00. As of early July 2005, the delinquency on the mortgage was $23,923.58 (the

"Reinstatement Amount"), and Countrywide had scheduled a foreclosure sale for July 27, 2005.
During the first week of July 2005, the Debtors were approached by Brian Colsia, a member of
the Defendant. Colsia offered to lend the Debtors the Reinstatement Amount under certain terms
and conditions. The Debtors accepted his proposal.

Under the terms of a Loan Agreement and Promissory Note dated August 1, 2005 (the
"Agreement"), the Debtors agreed that (1) the Defendant had advanced on their behalf the
Reinstatement Amount to Countrywide; (2) the "funds advanced" were to be due and payable
twelve months from August 1, 2005; (3) the "total amount due shall be $47,865.16;" and (4) the
Debtors would make payments in the amount of the monthly payment on the mortgage to the
Defendant on or before the fifth day of each month. Pursuant to the Agreement, the Debtors
executed and delivered to the Defendant a warranty deed (the "Conveyance") for the Residence
which was "to be held by [the Defendant] in escrow to ensure compliance with the terms [of the
Agreement]." In the event that the Debtors failed to timely forward mortgage payments to the
Defendant, it could record the warranty deed "to protect its interests." Upon payment in full of
all outstanding debt to the Defendant by the Debtors, the unrecorded deed was to be returned to
the Debtors.

The Defendant paid the Reinstatement Amount to Countrywide, but the Debtors
defaulted on their obligation to make monthly mortgage payments to the Defendant.
Consequently, on December 8, 2005, the Defendant recorded the deed to the Residence. The
Defendant subsequently commenced eviction proceedings against the Debtors. An eviction
hearing was scheduled for the Petition Date but was stayed by the filing of the Debtors'
bankruptcy petition. On February 14, 2006, the Defendant sought relief from the automatic stay

3

in order to proceed with its eviction.  On March 14, 2006, the Debtors filed the complaint

commencing this adversary proceeding.  On March 15, 2006, the Court denied the Defendant's

motion for relief from the stay and on March 24, 2006, entered an order requiring the Debtors to

make certain adequate protection payments to the Defendant (the "AP Order") (Doc. No. 41).

The Debtors subsequently failed to maintain the adequate protection payments required by the

AP Order and the Court entered an order granting the Defendant relief from the stay to proceed

with the eviction of the Debtors on June 15, 2006 (Doc. No. 54).  The Defendant was not

receiving monthly payments from the Debtors and ceased making payments to the holder of the

first mortgage.  On September 27, 2006, the mortgagee obtained relief from the stay (Doc. No.

75).  On March 17, 2007, the first mortgagee sold the Residence at foreclosure for the sum of

$225,000.00 to a third party.  The Debtors must vacate the Residence by June 1, 2007.


## III. DISCUSSION

At the beginning of the trial the parties agreed that the foreclosure sale of the Residence

by the first mortgagee to a third party effectively rendered the remedy of recision of the recorded

deed from the Debtors to the Defendant moot.  Accordingly, the Debtors did not present any

evidence on Count IV and are not seeking recision as a remedy under any other count.  In

addition, the Debtors conceded that the only remaining remedy available for the summary

judgment ruling in their favor on Counts I and II would be damages under NH RSA 358-A.  For

those damages to arise the Court would need to find that the conduct which resulted in liability

under those counts was also a violation of NH RSA 358-A under Count III.  The Debtors did not

present any evidence at trial regarding Count V.  At the close of the trial, the Debtors argued that

4

the violations established under Counts I and II are *per se* violations of NH RSA 358-A under controlling federal law and prior decisions in this district.

## A. Liability Under NH RSA 358-A

NH RSA 358-A:2 makes it "unlawful for any person to use any . . . unfair or deceptive act or practice in the conduct of any trade or commerce within this state." Whether a person has committed an unfair or deceptive act is a question of fact for the Court. Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1146 (1st Cir. 1993). "A practice is 'unfair' if (1) it is 'within at least the *penumbra* of some common-law, statutory, or *other established concept of unfairness*," (2) "it is immoral, unethical, oppressive, or unscrupulous," or (3) "it causes substantial injury to consumers." Id. (citing Rizzuto v. Joy Mfg. Co., 834 F.2d 7, 8 (1st Cir. 1987) (citations omitted)). "A practice may be 'deceptive' . . . if it 'could reasonably be found to have caused a person to act differently from the way he otherwise would have acted.'" Id. (citing Kazmaier v. Wooten, 761 F.2d 46, 51 (1st Cir. 1985)).

The undisputed evidence at trial confirmed the Court's ruling on the SJ Motion that the Defendant had violated New Hampshire law: (1) by failing to disclose the interest on its consumer credit transaction with the Debtors at an annual rate of interest and to compute such interest according to the actuarial method as earned on the outstanding unpaid balances for the actual time outstanding as required under NH RSA 358-K:4 (Count I); and (2) failing to disclose the rate of interest or the total cost of interest at the inception of the transaction as required by NH RSA 399-B:2 (Count II). Brian Colsia, the managing member of the Defendant, testified that it began entering into transactions similar to the one with the Debtors in 2005 and quickly learned that it would be difficult to make any money in such transactions due to the poor

financial condition of the consumers for whom it was advancing money.  After no more than ten such transactions during 2005, the Defendant ceased all such activity.  Colsia testified that he fully described the proposed transaction to the Debtors but did not give the required disclosures required by NH RSA 399-B or charge interest in the manner required by NH RSA 358:K because he was unaware of those requirements.

This conduct is squarely within the proscriptive penumbra of the consumer protection statute.  NH RSA 358-A:2; Chroniak, 983 F.2d at 1147; Arsenault v. Realty Funding Corp., 184 B.R. 864, 874 (Bankr. D.N.H. 1995).  Accordingly, the conduct of the Defendant which resulted in summary judgment in favor of the Debtors under Counts I and II is also an unfair act prohibited by NH RSA 358-A:2.  Although no explicit remedy is available to the Debtors under NH RSA 358-K (Count I) or NH RSA 399-B (Count II), the remedies available under NH RSA 358-A are available since the conduct also violates that statute.  NH RSA 358-A:2; Chroniak, 983 F.2d at 1147; Arsenault, 184 B.R. at 874.

The undisputed evidence at trial also shows that the Defendant told the Debtors that the deed was intended as security for the loan and that they understood the execution and delivery of the deed as security.  However, to the extent that a consumer understands the concept of their residence as security for a loan, they are most likely to view the documentation as a mortgage.  The testimony of Karl Comtois confirmed that he understood that he needed to repay twice the amount of the loan necessary to cure the mortgage arrearage within one year and that he needed to make monthly mortgage payments to the Defendant, but that he did not understand either the legal or practical difference between executing and delivering a deed in escrow and granting a mortgage.  Karl Comtois testified that he would not have entered into the transaction with the

6

Defendant if he had understood what he was bargaining away.  The Court finds his testimony indicative of a lack of disclosure or understanding of a key aspect of the nature of the transaction with the Defendant.  Although the Debtors' options in July of 2005 were limited, if they had understood the implications of delivering an executed deed into escrow, they may have made further inquiries and may have learned of the opportunity to cure their mortgage arrearage through a chapter 13 bankruptcy proceeding.

The terms of the escrow into which the executed deed was delivered deprived the Debtors of the procedural and redemption rights afforded to them under New Hampshire mortgage law.  See NH RSA 479:18 (redemption after default); 479:25 (notice of a foreclosure sale and right to a public sale); 479:13 (right to an account of obligations secured).  In addition, the form of the transaction also eliminated any fiduciary duty on the part of the Defendant to obtain a fair and reasonable price for the Debtors' residence if they defaulted in their obligations to it.  Bascom Const., Inc. v. City Bank and Trust, 137 N.H. 472, 475 (1993); Murphy v. Fin. Del. Corp., 126 N.H. 536, 541 (1985).   Based upon the record at trial, the Court finds that the Defendant failed to disclose to the Debtors the legal and practical significance of executing and delivering the deed in escrow as opposed to granting a mortgage.  Under the circumstances of this case, the failure to disclose to the Debtors the essential differences between a mortgage as security and the delivery of a deed as security was an unfair and deceptive act or trade practice. Accordingly, such conduct by the Defendant also violates NH RSA 358-A:2.

**B.  Remedies Under NH RSA 358-A**

NH RSA 358-A:10 provides a private right of action for any person injured by an act or practice which violates the statute.  If the Court finds for a plaintiff in such an action it must

7

The Court shall enter a separate order (1) finding for the Debtors on Count III, (2) awarding the statutory damages of $1,000.00 each for violations set out in Counts I, II and III, (3) finding for the Defendant on Counts IV and V, and (4) directing the Debtors to file with the Court an itemization of their costs and attorney's fees in prosecuting this matter.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment consistent with this opinion.

ENTERED at Manchester, New Hampshire.

Date:   May 18, 2007

/s/ J. Michael Deasy
J. Michael Deasy
Bankruptcy Judge