1   Andrea J. Shaw
    State of New Hampshire
2   Banking Department
    64B Old Suncook Road
3   Concord, NH 03301

4                   State of New Hampshire Banking Department

5

6
    In re the Matter of:            )   Case No.: 06-087
7                                   )
    State of New Hampshire Banking  )   Cease and Desist Order
8   Department,                     )   Staff Petition
                                    )
9                                   )
              Petitioner,           )
10                                  )
          and                       )
11                                  )
    MAK Investments, Brian Colsia, Gabe )
12                                  )
    Cohen, and Laura Cohen,         )
13                                  )
              Respondents           )
14   _____ )

15

16                          __STATEMENT OF FACTS__

17   I.    The staff of the Banking Department, State of New Hampshire (hereinafter

18   referred to as the "Department") alleges the following facts:

19              __Mortgage Banking and/or Brokering – RSA 397-A__

20      1. MAK Investments LLC (hereinafter "MAK") offers loans secured by a

21         mortgage to individuals facing foreclosure.

22      2. MAK is not licensed to conduct mortgage banking or brokering activities

23         in New Hampshire, nor do they qualify for an exemption from licensure

24         pursuant to RSA 397-A:4.

25      3. MAK registered as a domestic limited liability company with the New

        Hampshire Secretary of State on May 4, 2004.  Its sole manager is Brian

                            Cease and Desist Order - 5

W. Colsia.  Its principal address is 270 Main Street, Manchester, New Hampshire.

4. Mr. Gabriel Cohen and Mrs. Laura Cohen are employees or agents of MAK. Hereinafter Mr. Colsia, Mr. Cohen and Mrs. Cohen and MAK shall be referred to collectively as "MAK".

**Consumer A:**

5. Consumer A is the owner and occupant of a single family home on certain real estate located at 639 Old Country Road South, Francestown, NH (herein after "Premises A").

6. Premises A is subject to a first mortgage held by CitiCorp Mortgage Inc. ("CitiCorp").  Premises A is also subject to a second mortgage held by TD BankNorth, N.A.

7. Consumer A defaulted on the obligation to CitiCorp.  As a result of this default, on or about May 11, 2005, Consumer A received a Notice of Mortgage Foreclosure Sale scheduled to be held at public auction at Premises A on June 9, 2005.

8. For reasons not germane to the issue at hand, the foreclosure auction was postponed until July 6, 2005.

9. Prior to the foreclosure auction initially scheduled for June 9, 2005 a representative of MAK, Mr. Gabe Cohen, contacted Consumer A with a proposal to stop the foreclosure action.

10. Through Mr. Cohen MAK offered Consumer A "short term lending" assistance with an underlying mortgage securing the loan, or, alternatively acquisition of the property prior to the foreclosure.

11. Consumer A initially declined the offer as she was attempting to obtain other financing.

12. Despite her efforts Consumer A was not able to obtain alternate financing.

13. Consumer A  contacted MAK on July 5, the night before the scheduled July 6 foreclosure.

14. On the evening of July 5 Mr. Cohen on behalf of MAK offered what Consumer A understood to be an unsecured loan in the amount necessary to reinstate the mortgage loan to Citicorp and stop the foreclosure sale.

15. Consumer A inquired as to the cost of the loan.  Mr. Cohen told Consumer A "what you borrow is what you pay". Consumer A did not understand that meant she would pay back the principal plus the same amount borrowed as a finance charge.

16. Consumer A did not receive any written information regarding this unsecured loan until the next morning, the morning of the foreclosure sale.

17. On July 6, 2005 Consumer A attempted to meet Mr. Cohen at his office at 649 Second Street, Ste 2, Manchester, NH 03102 for the purposes of consummating the unsecured loan prior to the foreclosure sale that day.

18. Mr. Cohen was not available when Consumer A arrived at his office.

19. Mrs. Laura Cohen, Mr. Cohen's wife, was present at the office and she indicated that Mr. Cohen was not available, but she had all of the documentation needing Consumer A's signature.

20. Mrs. Cohen presented Consumer A with a document entitled "Affidavit in Lieu of Promissory Note" ("Affidavit").  Under the terms of the Affidavit, MAK agreed to lend Consumer A $15,100.30 for purposes of stopping the scheduled foreclosure.

21. The Affidavit required Consumer A to sign a Note with the specific terms of the lending arrangement between MAK and Consumer A at a later unspecified date.

22. The Affidavit required Consumer A to repay $30,200.60 to MAK on July 6, 2006, 12 months from the execution date of the Affidavit.

23. At this time Mrs. Cohen produced a deed conveying ownership of the property from Consumer A to MAK.

24. Consumer A questioned why she was being asked to sign a deed for what she thought was an unsecured loan.

25. Mrs. Cohen told Consumer A that the deed would only be recorded in the event that Consumer A defaulted on the terms of the agreement.

26. The Affidavit would remain in affect until Consumer A received and signed the promissory note according to the terms stated in the Affidavit.

27. At no time while executing the above referenced documents was Consumer A made aware that the terms stated in the promissory note (which she had not seen) would differ from the terms included in the affidavit.

28. MAK tendered funds required to stop the Citicorp foreclosure.

29. Three weeks after stopping the foreclosure, Consumer A still had not received the aforementioned promissory note.

30. Consumer A emailed Mr. Cohen to inquire as to when she would receive the promissory note.

31. In response to the e-mail the promissory note was faxed to Consumer A on July 24, 2005.

32. Consumer A told Mr. Cohen that she wished to have her attorney review the documentation prior to execution of said documents.

33. In response, Mr. Cohen told Consumer A she must sign the note and provide MAK a check for the amount of her CitiCorp mortgage by the end of the day.

34. MAK stated the check should be made payable directly to MAK (not to CitiCorp.)

35. There are at least three (3) similar Promissory Notes filed in County Registry of Deeds throughout New Hampshire.

36. Two (2) were filed with the Registry after September 12, 2005, with one being filed prior to September 12, 2005.

37. The promissory note required that all first mortgage payments to the holder of the first mortgage (CitiCorp) must be made directly to MAK and MAK would forward the payment to CitiCorp.

38. The first mortgage payment, if made by check, should be made payable to MAK not CitiCorp according to MAK's instructions.

39. Once Consumer A became aware of this new requirement, she refused to sign the note on the advice of her attorney.

40. Concerned about defaulting on her first mortgage, Consumer A wrote a check directly to CitiCorp and then sent the CitiCorp check to MAK.

41. Consumer A stated that MAK agreed to this change.

42. Upon review of the promissory note, its terms differed greatly from the signed Affidavit.

43. In addition, Consumer A stated that the verbal agreement between she and MAK differed from both the Affidavit and the unsigned promissory note.

44. Consumer A and Mr. Cohen set up a meeting at the Second Street office for Monday, July 27, 2005 to turn over the Citicorp check. Neither Mr. Cohen nor anyone else was present at the office.

45. On August 3, 2005, Mr. Cohen delivered an eviction notice to Consumer A stating that the terms of the unsigned promissory note had been breached.

46. According to the terms of the Affidavit as presented to Consumer A no interest or principal payments were due to MAK until the end of a 12 month period, which ended on July 6, 2006.

47. CitiCorp contacted Consumer A with refinancing options in August 2005.

48. On August 9, 2006 MAK recorded the deed, purportedly held as security for repayment, claiming Consumer A breached their agreement.  The deed is recorded in the Hillsborough County Registry of Deeds in Book 7520 Page 2998.

49. As a result of MAK recording the deed prior to consummation of the refinance, Consumer A was unable to payoff the MAK mortgage.

50. Since MAK filed the deed, Consumer A has not received any tax bills or other legal documents relating to the property, as they are sent directly to MAK.

51. As a result, CitiCorp has paid the taxes our of Consumer's A escrow account.

52. Consumer A's town welfare was cancelled because she no longer owns property in the town, which is a prerequisite for receiving town welfare assistance.

53. Consumer A could not make her payment to CitiCorp.  MAK made mortgage payments for five months, and then stopped making payments.  CitiCorp told Consumer A to make payments by the 24th of each month.

54. Once Mak filed the deed, Mak began eviction proceedings against Consumer A.

55. Consumer A had retained an attorney who was able to get an injunction from the court to temporarily prevent the eviction. However, the

1    attorney has since withdrawn from the matter. A trial is set for August

2    2006.

3  56. As part of the eviction case MAK and Consumer A attempted mediation.

4    No settlement was reached.

5  57. MAK is now treating Consumer A as a tenant and indicated they want a

6    contractor to start making repairs on Premises A.  MAK also stated that

7    they do not have to give Consumer A prior notice before entering

     Premises A.

8  58. Currently Consumer A is still in her home contesting the eviction and

9    transfer of ownership of Premises A.

10

11 **Consumer B:**

  59. Consumer B is the owner of a single family residence located on certain

12    real estate at 549 Pembroke Street, Pembroke, New Hampshire (herein after

13    "Premises B").

14
  60. Premises B is subject to a mortgage in first position held by Conti

15    Mortgage Corp (hereinafter "Conti").  The mortgage loan is currently

16    serviced by Select Portfolio Servicing Inc. ("SPS").

17
  61. Sometime during early 2005 Consumer B defaulted on the obligation owed

18    to Conti.

19
  62. As a result, SPS placed the mortgage in foreclosure.

20
  63. On the morning of the foreclosure action, April 27, 2005,

21    representatives of MAK Investments, LLC ("MAK"), including Mr. Gabe

22    Cohen, approached Consumer B at her home, Premises B, with a proposal to

23    stop the foreclosure action.

24
  64. Consumer B was not aware that a foreclosure sale was scheduled for later

25    that day until MAK representatives arrived and notified Consumer B.

65. Consumer B subsequently confirmed with SPS that a foreclosure sale was set for 1:00 pm that day.

66. MAK proposed either short or long term loan financing, or acquisition of the property prior to the foreclosure.

67. On the scheduled date of the foreclosure action, at approximately 1:00 pm, Consumer B, Mr. Cohen, and Mr. Brian Colsia met to sign paperwork.

68. MAK did not give Consumer B any financing disclosures or copies of signed documents.

69. Consumer B later learned that the paperwork was a Purchase and Sale Agreement for the SPS payoff amount, plus $10,000 to Consumer B.  The agreement also provided that Consumer B had 30 days to pay back the amount loaned plus $25,000, all costs to buyer, including tax stamps and expenditures.  In addition, the agreement required Consumer B to obtain a commitment letter for the financing of the sale of the property by May 13, 2005.

70. If the aforementioned conditions were not met, Consumer B was required to vacate the property by May 27, 2005.  If Consumer B failed to vacate Premises B May 27, $100 a day was to be deducted from the $10,000 MAK owed Consumer B, which was part of the purchase price stated in the above referenced agreement.

71. Consumer B stated that later on the same day of the scheduled foreclosure sale MAK sold Premises B to a Mr. T. Richards, via a warranty deed.

72. The warranty deed was recorded in the Merrimack County registry in Book 2770 Page 0395, on April 27, 2005.

73. It is unclear how MAK obtained marketable title to convey Premises B to Mr. Richards.

74. On May 2, 2005, SPS posted receipt of $66,000, removing the mortgage loan on Premises B from foreclosure status.

75. May 4, 2005 Mr. Richard granted a mortgage to MAK as evidenced in the County Registry at Book 2773 Page 0173.

76. Meanwhile, Consumer B requested copies of the documentation Consumer B signed from MAK.

77. After several requests MAK faxed what they insisted was the only paperwork Consumer B required on May 10, 2005, including a financing extension allowing Consumer B until May 23, 2005 to pay approximately $175,000 to MAK and reclaim title to her home.

78. The next day, May 11, 2005, Consumer B received a mortgage bill from SPS in the amount of $674.57.

79. On May 25, 2005, MAK discharged the mortgage from Mr. Richards in the county registry in Book 2895 Page 0597.

80. July 30, 2005 SPS received a payment in the amount of $2,000, which was paid by check from MAK.  The memo line of the check stated Consumer B's name and Premise B's address.

81. On March 28, 2006 Consumer B entered into a forbearance agreement with SPS.

82. Three days later on March 31, 2006, SPS received another payment of $1,000 which was paid through Western Union, with Consumer B's name and account number listed on it.

83. On May 25, 2006, a Mr. Gabriel Bilc recorded a warranty deed granting the premises from Mr. Richards to Mr. Gabriel Bilc.

84. Immediately upon obtaining title, Mr. Bilc granted a mortgage on Premises B to MAK.

85. At present it appears the property is owned by Mr. Bilc, but how he obtained marketable title is unclear.

**Consumer C**

86. Consumer C is the owner of a single family residence located on a certain real estate at 40 Trail View Drive, Gilford, NH (herein after "Premises C").

87. As of March 2006, Premises C was subject to a mortgage in first position held by Novastar Mortgage Inc (hereinafter "Novastar").   Premises C was also subject to a mortgage in second position by MAK Investments LLC ("MAK").

88. In June 2005, Consumer C was experiencing difficulty in obtaining mortgage statements from Novastar.

89. When Consumer C inquired as to the reason Novastar was not sending statements, Novastar stated it (Novastar) did not hold a mortgage to Premises C.  However, it was later discovered that Novastar did hold a mortgage on Premises C.

90. Consumer C was unable to determine the amount of and location where a payment should be sent as Novastar repeatedly told Consumer C they did not hold a mortgage on Premises C.

91. Consumer C was unable to send timely mortgage payments to Novastar due to Novastar's confusion.

92. As a result Novastar placed Consumer C into foreclosure.

93. A business card containing Mr. Colsia's name as representative for MAK was left at Consumer C's house offering assistance with Consumer C's current foreclosure situation.

94. Consumer C contacted MAK and on June 23, 2005. Consumer C signed a Note and Mortgage with MAK.  According to the terms of the loan MAK would advance $11,150.22 in principal to Novastar.  In return Consumer C would play MAK $4,000 in interest and pay MAK the principal in full 6 months from executing the loan.  In addition, Consumer C would make monthly payments of $300 in interest to MAK.

95. Additionally, MAK required the first mortgage payment (to Novastar) in the amount of $1,216.22 to be sent to MAK and MAK would forward the payment to Novastar.

96. The loan was secured by Premises C and a mortgage deed was recorded at the Hillsborough County Registry of Deeds in Book 2188 on Page 0147 on June 27, 2005.

97. The first payment was due to MAK the day after execution of the loan documents.

98. However, MAK insisted on Consumer C paying $300 more than what Consumer C originally agreed.  Consumer C paid MAK $1,816.22 at that time.

99. From August to November 2005, Consumer C paid $1,516.22 a month directly to MAK.

100. However, MAK failed to forward the payments to Novastar in a timely manner.

101. Once Consumer C discovered MAK failed to forward the Novastar payments in atimely manner Consumer C felt she had no choice but to start paying

1   Novastar directly and give MAK the $300 interest payment. per month
2   separately.

3   102.   The above referenced modification took place beginning in December 2005
4   and ended in March 2006.

5   103.   Once Consumer C began sending her first mortgage payments directly to
6   Novastar, Mr. Colsia became verbally threatening and abusive.

7   104.   Mr. Colsia insisted that he was paying the Novastar mortgage; however,
8   Consumer C confirmed with Novastar that Mr. Colsia's statement was not
9   true.

10  105.   MAK sent Consumer C a bill for the amount of the Novastar mortgage
11  payments that Consumer C did not send directly to MAK.  It is unclear if
12  no payments were made or if the payments were simply late.

13  106.   Also of concern for Consumer C was MAK's requirement that payment be made
14  either in cash or cashier's check.

15  107.   Most months Consumer C made her payments in person at MAK's request, or
16  MAK would suggest the money be left hidden at Premises C for Mr. Colsia
17  to pick up.

18  108.   Consumer C refinanced their mortgage on April 26, 2006 in order to
19  payoff the MAK and Novastar mortgages.

20  109.   Consumer C's new mortgage broker requested a payoff statement from Mr.
21  Colsia, as the managing member of MAK.

22  110.   Mr. Colsia's payoff statement was $18,000, which was contrary to the
23  amount contained in the note.

24  111.   Mr. Colsia informed the new mortgage company that the $18,000 figure was
25  "inclusive of all principal, interest, prepaids, and penalties."  MAK
    provided no further explanation.

112.   The second mortgage granted to MAK was discharged and said discharge was recorded in the County Registry in Book 2293 on Page 0908_on May 2, 2006.

II.   The staff of the Banking Department, State of New Hampshire alleges the following issues of law:

**Chapter 397-A Mortgage Banking and Brokering**

1. The Department incorporates by reference and realleged herein paragraphs 1 to 112.

2. The  Department has jurisdiction over the licensing and regulation of persons engaged in mortgage banker / broker activities pursuant to New Hampshire RSA 397-A:3.

3. RSA 397-A:3 requires any person not exempt under RSA 397-A:4 that, in its own name or on behalf of other persons, engages in the business of making or brokering residential mortgage loans secured by real property located in this state shall be required to obtain a license from the banking department.  MAK violated this law by offering mortgage loans secured by single family New Hampshire real estate to Consumers A, B and C without a license.

4. Pursuant to NH RSA 397-A:18, the Department has the power to issue and to serve an order requiring persons to cease and desist from violations of the chapter whenever it has reasonable cause to believe that any person has engaged in any act or practice constituting a violation of the banking laws, or any rule or order thereunder.  Respondent has violated RSA 397-A:3 by conducting unlicensed mortgage banker / broker activities in New Hampshire.  Based on the Consumer information provided and the similar Registry of Deeds entries, the Department has reasonable cause to believe that MAK engaged in unlicensed mortgage banking and has

1   reasonable cause to believe that with out a Cease and Desist Order MAK
2   will continue to violate this law.
3   5. Pursuant to NH RSA 397-A:17 mortgage bankers/brokers engaging in
4       business in New Hampshire are prohibited from engaging in unethical
5       business practices.  Based on the fact stated about, MAK's changing the
6       terms of the loan from the verbal discussion to the time it was reduced
7       to a promissory note and other actions as set forth in Section I are
8       sufficient to constitute unethical business practices.

**Chapter 398-A - Second Mortgage Loans**

9   1. The Department incorporates by reference and realleged herein
10      paragraphs 1 to 112.
11  2. The Department has jurisdiction over the licensing and regulation of
12      persons engaged in second mortgage banker / broker activities pursuant
13      to NH RSA 398-A:1-a.
14  3. Prior to September 2005 RSA 398-A:1-a required that any person engaged
15      in the business of making or brokering second mortgage loans secured by
16      real property located in the state of New Hampshire, which is or shall
17      be occupied in whole or in part as a primary domicile or place of
18      residence by the borrower and which consist of not more than 4 living
19      units, unless the person first obtains a license as provided by in the
20      Chapter, except when the person lending money is the seller of the real
21      estate upon which the second mortgage is to be taken as security.
22      Based on the facts stated above MAK violated this section of the law by
23      making subordinate lien mortgage loans on single family homes located
24      in New Hampshire without a license.
25  4. Pursuant to NH RSA 398-A:1-b VI the Department has the power to issue
        and to serve an order requiring persons to cease and desist from
        violations of the chapter whenever it has reasonable cause to believe
        that any person has engaged in any act or practice constituting a

violation of the banking laws, or any rule or order thereunder.

Respondent has violated RSA 398-A:1-a by conducting unlicensed second

mortgage banker / broker activities in New Hampshire prior to September

4, 2005. Based on the facts stated in Section I the Department has

reasonable cause to believe that MAK violated this provision by making

mortgage loans to Consumer A and Consumer C and holding the deed as

security for repayment of that loan.

5. Pursuant to NH RSA 398-A:1-b(I)(j) mortgage bankers/brokers engaging in

business in New Hampshire are prohibited from engaging in unethical

business practices. Based on the facts stated above, MAK's changing

the terms of the loan from the verbal discussion to the time it was

reduced to a promissory note is sufficient to constitute an unethical

business practice.

**Chapter 399-D - Debt Adjuster**

1. The Department incorporates by reference and realleged herein paragraphs

1 to 112.

2. The Department has jurisdiction over the licensing and regulation of

persons engaged in debt adjustment activities with New Hampshire

consumers pursuant to NH RSA 399-D:3.

3. RSA 399-D:3 requires any person not exempt under RSA 399-D:4 that

engages in the business of debt adjustment with New Hampshire consumers

is required to obtain a license from the banking department. MAK

violated this provision by requiring consumers to make their first

mortgage payments directly to MAK with the condition that MAK would

forward the payment on to the first mortgage company without a debt

adjuster license.

4. Pursuant to NH RSA 399-D:23 II the Department has the power to issue and

to serve an order requiring persons to cease and desist from violations

of the chapter whenever it has reasonable cause to believe that any person has engaged in any act or practice constituting a violation of the banking laws, or any rule or order thereunder. Respondent has violated RSA 399-D:3 by conducting unlicensed debt adjustment activities in New Hampshire. Based on the above facts the Department has reasonable cause to believe that MAK has violated and will continue to violate this provision by receiving for compensation and as agent of debtors, debtors' money for the purposes of distributing money to creditors in full or partial payment of obligations of the debtor.

5. Pursuant to NH RSA 399-D:13 I(j) debt adjusters engaging in business in New Hampshire are prohibited from engaging in unethical business practices. This section was violated by MAK taking debtor's funds and failing to forward them to the creditor in a timely manner.

### RELIEF REQUESTED

The staff of the Banking Department requests the Commissioner take the following action:

1. Find as fact the allegations contained in section I of the Statement of Allegations of this petition.

2. Make conclusions of law relative to the allegations contained in section II of the Statement of Allegations of this petition.

3. Pursuant to New Hampshire RSA 397-A:18, RSA 398-A:1-b IV, and RSA 399-D:23 II, immediately Order Respondent to Cease and Desist from violations of the New Hampshire Banking Laws.

4. Take such other administrative and legal actions as are necessary for enforcement of the New Hampshire Banking laws, the protection of New Hampshire citizens, and to provide other equitable relief.

1

**RIGHT TO AMEND**

2      The Department reserves the right to amend this Petition for Relief and

3   to   request   that   the   Banking   Department   Commissioner   take   additional

4   administrative   action.    Nothing   herein   shall   preclude   the   Department   from

5   bringing additional enforcement action under RSA 397-A, RSA 398-A or RSA 399-D

6   or the regulations thereunder.

7

8   Respectfully submitted by:

9

10   _____/S/_____        _____7/6/06_____
     Andrea J. Shaw                          Date
11   Staff Attorney

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF NEW HAMPSHIRE BANKING DEPARTMENT

| | | |
|---|---|---|
| In re the Matter of: | ) | |
| | ) | |
| State of New Hampshire Banking | ) | Case No.:  06-087 |
| Department, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MAK Investments, Brian Colsia, | ) | |
| Gabe Cohen, and Laura Cohen, | ) | |
| | ) | |
| Respondents. | ) | |

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT is made this 19th day of November, 2007 by and between the State of New Hampshire Banking Department ("Department"),  MAK Investments, Brian Colsia, Gabe Cohen and Laura Cohen ("Respondents") and Joseph Gallagher.

WITNESSETH:

WHEREAS, on or about July 7, 2006 the Department commenced this petition by a Staff Petition and amended the petition on November 15, 2006 for, among other reasons, to add a consumer designated as "Consumer E" who is Joseph Gallagher (hereinafter the "Consumer"); and

WHEREAS, the Respondents timely objected to the entry of a cease and desist order and indicated they would contest the petition on a variety of grounds;

WHEREAS, thereafter, the Respondents and the Department met to discuss a resolution of the matter which discussions resulted in the execution and entry of a Consent Decree which was signed by the Commissioner on May 16, 2007 (the "Decree");

WHEREAS, pursuant to the terms of the Decree, all matters were resolved other than a determination of whether any restitution should be paid to the Consumer;

WHEREAS, pursuant to the terms of the Decree the parties held the first day of a hearing to determine whether any restitution was to be awarded to the Consumer on August 29, 2007; and

WHEREAS, following the first day of hearings the Respondents and the Consumer entered into settlement discussions.

NOW THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, the parties agree as follows:

1. <u>Payment of Restitution.</u>   Within five (5) days of the entry of an order by the Commissioner approving this Settlement Agreement the Respondents shall pay the Consumer twenty-five thousand dollars ($25,000) (the "Payment").  The Payment shall represent the complete and final resolution of, and discharge of any basis for any further civil or administrative proceeding by the Department against the Respondents for any violations arising as a result of or in connection with actions or omissions by the Respondents through the date of this Order as to the Consumer. With the entry of the order approving this Settlement Agreement and the Consent Decree entered May 16, 2007

the above-captioned matter shall be concluded by the Department and closed.

2. <u>Releases.</u>   Consumer for and in consideration of the Payment,  and other valuable consideration received from the Respondents, the receipt of which is hereby acknowledged, does hereby remise, release, acquit, satisfy, and forever discharge the said Respondents, of and from all manner of actions, causes of action, suits, debts, covenants, contracts, controversies, agreements, promises, claims and demands whatsoever, which Consumer ever had, now has, or which Consumer or any personal representative, successor, heir or assign of Consumer, hereafter can, shall or may have, against Respondents, by reason of any matter, cause or thing whatsoever, from the beginning of time to the date of this instrument, including, but not by way of limitation, relating in any way whatsoever to any of the claims, action or causes of action raised or that could have been raised in the Staff Petition concerning Consumer, Respondents and the 22 West Chamberlain, Merrimack, New Hampshire property or in any proceedings relating thereto.

**WHEREFORE**, based on the foregoing, we have set our hands to this Agreement, with it taking effect upon the signature of Peter C. Hildreth, Bank Commissioner.

MAK INVESTMENTS, BRIAN COLSIA, GABE
COHEN AND LAURA COHEN

By their attorneys,

McLANE, GRAF, RAULERSON &
MIDDLETON,
PROFESSIONAL ASSOCIATION

By: _____ /S/ _____
            Wilbur A. Glahn, III
            Joseph A. Foster
            900 Elm Street, P.O. Box 326
            Manchester, NH 03105
            Telephone (603) 625-6464


_____ /S/ _____
James Shepard, Staff Attorney,
New Hampshire Banking Department


_____ /S/ _____
JOSEPH GALLAGHER, Individually

            and

by his attorney

_____ /S/ _____
Peter S. Wright
Franklin Pierce Law Center
2 White Street
Concord, N.H. 03301


Entered this 29th day of November, 2007.

_____ /S/ _____
Peter C. Hildreth,
Bank Commissioner

- 4 -