Case 1:09-cv-00372-JL   Document 3-6   Filed 11/11/09   Page 1 of 18

2006 BNH 029    Note:   This is an unreported opinion. Refer to AO 1050-1 regarding citation.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:                                                              Bk. No. 05-12604-JMD
                                                                    Chapter 7
Donald V. Drew, Jr.,
      Debtor


Timothy P. Smith,
Chapter 7 Trustee,
      Plaintiff

v.                                                                  Adv. No. 05-1137-JMD

MAK Investments, LLC, and
Brian Colsia,
      Defendants


*Peter S. Wright, Jr., Esq.*
*Franklin Pierce Law Center*
*Attorney for Plaintiff*
*Concord, New Hampshire*

*Grenville Clark III, Esq.*
*Gray, Wendell & Clark, P.C.*
*Attorney for Defendants*
*Manchester, New Hampshire*

**MEMORANDUM OPINION**

**I. INTRODUCTION**

    Timothy Smith, the Chapter 7 Trustee (the "Trustee"), brought suit against MAK Investments, LLC ("MAK") and Brian Colsia ("Colsia"), the managing member of MAK (collectively the "Defendants"), seeking to avoid the transfer of the Debtor's residence to MAK

under the Bankruptcy Code and to collect damages pursuant to state law and the common law (the "Complaint"). In Count I of the Complaint, the Trustee seeks to avoid the transfer of the Debtor's residence to MAK as a fraudulent transfer under 11 U.S.C. § 548(a)(1). In Count II, the Trustee seeks double or treble damages plus fees and costs pursuant to New Hampshire Rev. Stat. Ann. ("NH RSA") 358-A, the New Hampshire Consumer Protection Act (the "CPA"). In Count III, the Trustee seeks an award for the damages caused by MAK's tortious interference with contracts, pursuant to the common law. In Count IV, the Trustee seeks the actual damages caused by MAK defrauding the Debtor, pursuant to the common law. Finally, the Trustee seeks a determination that Colsia is personally liable for the claims set out in Counts I through IV because he used a limited liability company to perpetrate injustice or fraud. The Defendants filed a counterclaim for breach of contract, for which it seeks damages.

On May 11, 2006, the Court held a one-day trial, during which the Trustee withdrew the tortious interference claim. At the close of the trial, the parties agreed to submit post-trial memoranda of law and the Court took the matter under advisement. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. BACKGROUND

### A. Undisputed Facts

This is an action to avoid a prepetition transfer made by the Debtor to MAK and for damages under state law. The property that was transferred consisted of the Debtor's residence

of twenty-two years ("Residence"). The following facts are uncontested. The Debtor and Colsia met for the first time on May 14, 2005 (the "Transaction Date"), when Colsia rang the Debtor's doorbell to discuss helping the Debtor "save his house" from a pending foreclosure. On the same day, the parties executed a Sales Agreement and Deposit Receipt (the "Sales Agreement") in which the Debtor agreed to convey title to the Residence on or before May 14, 2005, to MAK by warranty deed, while MAK agreed to pay the foreclosing attorney's office $18,997.90[1], pay off the first mortgage and late fees, and cover all closing costs (collectively the "Transaction"). The Sales Agreement included an Additional Provisions Addendum (the "Addendum"), which obligated MAK to honor an exclusive purchase and sales agreement between the Debtor and an identified buyer, Joseph Courtney ("Courtney"), by obligating MAK to deliver a deed to Courtney on or before June 30, 2005, in exchange for the Debtor reimbursing MAK for all costs related to the Transaction plus a $25,000.00 fee. The Addendum also called for the Debtor to vacate the Residence on June 30, 2005, with no further recourse, if the sale to Courtney did not close. The Sales Agreement, with the attached Addendum, was fully executed and notarized in the Residence on the Transaction Date. On the same day, the Debtor signed a warranty deed (the "Deed") granting MAK title to the Residence, which MAK recorded on May 16, 2005.

Prior to the Transaction Date, the Debtor had listed the Residence with a real estate broker (the "Broker") who received an offer to purchase the Residence that did not go through. The offer to purchase from Courtney, a second prospective buyer, was pending as of the Transaction Date. Sometime thereafter the deal with Courtney also fell through. The Debtor responded by asking the Broker to continue to try to sell the Residence, and the Broker found a new buyer. On June 11, 2005, the Debtor sent a fax to Colsia requesting that the he substitute the

---

[1] The Court notes that this amount coincides with the amount needed to reinstate the mortgage.

new buyer for Courtney so he could sell the Residence rather than be rendered homeless as of June 30, 2005. The Debtor ceased his efforts to sell after he learned a new buyer could not be substituted.

As of the Transaction Date, the Residence had an approximate value of $164,750.00.[2] The Debtor filed his Chapter 7 bankruptcy petition on June 30, 2005, the date specified in the Addendum for the Debtor to vacate the Residence. To date, the Debtor has not vacated the Residence. Neither party has paid any money directly to the other party. The balance on the Debtor's mortgage remains unpaid.

### B. Disputed Issues

The Trustee asserts the Transaction was a fraudulent transfer pursuant to § 548(a)(1) because the Debtor did not receive "reasonably equivalent value" when he transferred title to the Residence, valued at $164,750.00, in consideration for MAK paying the foreclosing attorney's office $18,997.90 (the "Reinstatement Payment"). The Defendants counter that the Debtor received additional compensation because the Addendum reserved the right for the Debtor to sell the Residence to Courtney, if the Debtor had been able to close that sale; the Debtor's credit was "saved" by the mortgage being reinstated and the foreclosure being stopped; and MAK incurred additional expenses related to the Transaction that amounted to $12,372.95[3] (the "Additional Expenses"). Accordingly, one issue before the Court is whether the Reinstatement Payment plus

---

[2] The Trustee's appraiser valued the Residence at $167,000.00 as of June 30, 2005, while the Defendants' appraiser valued it at $162,500.00 as of April 21, 2006. The Defendants' appraiser testified that these two values are consistent with each other. Accordingly, the Court shall consider the value to be the average of the appraisers' values, or $164,750.00.

[3] MAK made $8,575.66 in post-Transaction expenditures, which include: tax stamps ($1,200.00), recording fees ($17.37), legal fees ($5,610.89), eviction-related costs ($197.40), insurance ($750.00), and an appraisal ($800.00). Additionally, MAK has paid $3,797.29 toward interest and principal on the mortgage.

4

the Additional Expenses (collectively the "Cumulative Consideration") amounted to reasonably equivalent value pursuant to § 548(a)(1).

The Trustee also asserts that he is entitled to double or triple statutory damages under the CPA because Colsia perpetrated an unfair or deceptive act by promoting the Transaction to the distraught Debtor as a refinancing arrangement rather than an outright sale with an option to resell to a particular buyer and, thereby, misrepresenting the nature of the Transaction. The Defendants counter that Colsia made it "clear as a bell" that the Transaction was an outright purchase of the Residence. Accordingly, the second issue before the Court is whether the circumstances that led to the culmination of the Transaction amounted to an unfair or deceptive act under state law and, if so, what the Trustee's damage award will be.

Finally, the Trustee asserts he is entitled to the actual damages caused by Colsia's fraudulent conduct, under common law fraud. The Defendants denied the allegation and reasserted their response to the CPA claim. Accordingly, the Court must determine if Colsia's conduct at the Transaction was fraudulent under New Hampshire common law.

The Defendants filed a counterclaim asserting that MAK is entitled to an award of damages for the losses caused by the Debtor's failure to vacate the Residence. The Trustee did not respond to the counterclaim either by answer or at the trial. The final issue before the Court is whether the MAK is entitled to damages due to the Debtor's breach of contract and, if so, what the Defendants' damage award will be.

## III. DISCUSSION

### A. Fraudulent Transfers and Reasonably Equivalent Value

#### 1. The Law

Section 548, the fraudulent transfer provision of the Bankruptcy Code, "allows the trustee to avoid a transaction made within one year before the commencement of the bankruptcy case, that depletes the debtor's assets to the detriment of the bankruptcy estate." Collier on Bankruptcy ¶ 548.01 (15th rev. ed. 1998). "Transfers . . . that are deemed to be constructively fraudulent, because they are made for less than reasonably equivalent value, when the debtor is, or is rendered, insolvent, undercapitalized, or unable to pay its debts as they become due" are recognized as fraudulent under the statute. Id. The relevant part of this statutory provision reads as follows:

> § 548 Fraudulent transfers and obligations.
>
> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> * * * *
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > (B)(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . . .

11 U.S.C. § 548(a)(1). Accordingly, the elements of a fraudulent conveyance under § 548 are: (1) a "transfer" of an interest of the debtor, (2) made within one year of the date of filing of the petition, (3) for less than a reasonably equivalent value, (4) while the debtor was insolvent, or that rendered him insolvent.

6

The parties agree that a transfer[4] of the Debtor's property occurred six weeks before the Debtor filed for bankruptcy protection, and that the Debtor's inability to pay his debts as they became due was demonstrated by the impending foreclosure on the Residence. Accordingly, the Court finds that three of the four elements have been met. Therefore, for the Trustee to prevail under Count I, he has the burden of proving by the preponderance of the evidence that the Debtor received less than reasonably equivalent value in the Transaction. Dahar v. Jackson (In re Jackson), 318 B.R. 5, 23 (Bankr. D.N.H. 2004).

Whether reasonably equivalent value has been given in a transaction is dependant on all the circumstances surrounding the transaction and is largely a question of fact. Collier on Bankruptcy, supra, at ¶ 548.05. Accordingly, the trier of fact is given considerable latitude in making this determination. Id. In this district, the determination of reasonably equivalent value under § 548 in a pre-foreclosure conveyance requires "a flexible approach that takes into account all aspects of the foreclosure sale" because the statute "requires a federal determination of reasonably equivalent value." In re Nat'l Envtl. Sys. Corp., 111 B.R. 4, 28 and 17 (Bankr. D.N.H. 1989). Since National Environmental was decided, the United States Supreme Court has held that real property transfers by insolvent debtors that occur within one year prior to filing a bankruptcy petition are conclusively made in exchange for reasonably equivalent value within the meaning of the Bankruptcy Code if the consideration is obtained from a non-collusive foreclosure sale conducted in conformance with applicable state law. BFP v. Resolution Trust Corp., 511 U.S. 531 (1994). However, the BFP Court emphasized that its holding "cover[s] only

---

[4] The Code defines the term "transfer" to be "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(58).

7

mortgage foreclosures of real estate," id. at 564 n.5, and noted that "the 'reasonably equivalent value' criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) outside the foreclosure context." Id. at 545. Accordingly, the Court finds that a flexible approach to a § 548 reasonably equivalent value determination, similar to the one used in National Environmental, remains appropriate for determination of reasonably equivalent value for voluntary pre-foreclosure transfers in New Hampshire.

The National Environmental Court articulated factors that should be considered on a case-by-case basis when determining reasonably equivalent value, which include: "the disparity between the price and the net market value, efforts to stimulate competitive bidding, the extent of advertising, whether an outside appraisal should have been obtained, and whether notice to local brokers would have been effective at promoting the sale." Nat'l Envtl., 111 B.R. at 20. Although some of the factors articulated in National Environmental would apply only in a foreclosure situation, the general approach to determination of reasonably equivalent value does apply to voluntary transfers shortly before a foreclosure sale. The Trustee argues he is entitled to prevail under a National Environmental factor analysis because: (1) the disparity between the market value ($164,750.00) and the Reinstatement Cost expended ($18,997.00) is large ($145,753.00); (2) even if the Additional Expenses ($12,374.00) are included, the disparity remains substantial ($133,379.00); and (3) the finality of the transfer foreclosed the opportunity for the Debtor to close the sale with any potential buyer other than Courtney, thereby prohibiting competitive sales activities. The Defendants also cited National Environmental in support of their general assertion that the Cumulative Consideration resulted in reasonably equivalent value but did not provide any analysis or valuation for the Cumulative Consideration.

8

Colsia testified he had a rough sense of the value of the property before he approached the Debtor on the Transaction Date. He also testified that he covered all expenses pertaining to the transfer and that he paid $1,200.00 in transfer taxes, which equates to a valuation of $80,000.00,[5] less than one half of the value established by the evidence at trial. No evidence or argument was offered at trial regarding how the consideration for the transfer was computed. Under the Sales Agreement, the transferee assumed and agreed to pay the first mortgage on the Residence. Assumption of a mortgage by a transferee is consideration for purposes of computing the real estate transfer tax. NH RSA 78-B:1-a(IV). The Debtor's schedules reflect a balance due on his mortgage of $53,149.00. When added to the Reinstatement Cost ($18,997.00) and the Additional Expenses ($12,374.00), the total ($84,520.00) is consistent with the amount of consideration declared by the transferee when it recorded the deed from the Debtor. Accordingly, based upon the evidence at trial, and the declaration to the State of New Hampshire when the deed of the Residence was recorded, the Court finds that the consideration for the transfer of the Residence was $80,000.00 or forty-nine percent of the opinion of fair market value offered by the Defendants' own appraiser at trial. Consideration in the amount of forty-nine percent of fair value paid by a knowledgeable real estate investor is not reasonably equivalent value. Accordingly, the Court finds the Trustee has established that the Transaction was a fraudulent transfer and thus is avoided under § 548(a).

---

[5] According to New Hampshire law, both the buyer and the seller are responsible for paying $.75 per $100 of the price or consideration paid upon the transfer of real property. RSA 78-B:1 and 4. Because the Defendants covered both the buyer's and the seller's costs, the payment of $1,200.00 in transfer taxes equates to a valuation of the consideration at $80,000.00.

9

## 2. The Remedy

If a transfer is avoided under § 548, the Trustee may recover either the property or the value of the property. 11 U.S.C. § 550(a). Section 550(a) provides in relevant part that:

> the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from–
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . .

Id. Because the Trustee has prevailed on his claim that the Transaction violated § 548(a), the Transaction is void. Accordingly, the Trustee may recover title to the Residence, or the value thereof, for the benefit of the estate.

Section 548(c), however, entitles a good faith transferee for value to a replacement lien to the extent of the value given for the interest in property that has been avoided. 11 U.S.C. § 548(c). Section 548(c) provides:

> (c) . . . a transferee or obligee . . . that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Id. Accordingly, to be entitled to a replacement lien pursuant to § 548(c), a transferee must: (1) have given value for the transfer and (2) have acted in good faith.

### (a) Value

Section 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of debtor, but does not include an unperformed promise to furnish support to the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Thus it the value element of the lien replacement test differs from the value requirement in § 548(a) because § 548(d)(2)(A) does not

require that the value be reasonably equivalent as § 548(a) does. In this case, it is uncontested that the MAK made the Reinstatement Payment as well as incurred the Additional Expenses. No evidence or argument has been offered to dispute that the total of those expenses ($31,371.00) constituted value. Accordingly, this requirement has been met. Nonetheless, the passing of value is but one element of a successful defense to a trustee's avoidance power under § 548(a). Good faith on the part of the Defendants is also an essential element.

### (b) Good Faith

As one bankruptcy resource has noted: "Good faith has been described in various ways. The unpredictable circumstances in which the courts may find its presence or absence render any definition of 'good faith' inadequate, if not unwise." Collier on Bankruptcy ¶ 548.07 (15th rev. ed. 1998). Many courts have determined that "[k]nowledge of the transferor's insolvency may, in the conjunction with other factors, prevent the transferee from asserting good faith." Id. Another approach to determining a transferee's good faith is to compare the values exchanged. Under this approach, a court may presume that a transferee has taken unfair advantage of the transferor if the "transferor [gave] up vastly more of his estate than he [got] in return." Good Faith and Fraudulent Conveyances, 97 Harv. L. Rev. 495, 504 (1983) (citing 1 G. Glenn, Fraudulent Conveyances and Preferences § 294 (1940)).

Colsia is a professional engaged in transactions with people in financial disstress. In this case, Colsia testified that his office staff identified the Debtor has a potential customer by finding the up-coming foreclosure of the Residence listed in banker's guides. Furthermore, Colsia knew the Debtor was facing an impending foreclosure and was not paying his financial obligations as they became due. Accordingly, the Court finds the Defendants knew, or should

11

have known, the Debtor was insolvent. Additionally, Colsia testified that when he rang the Debtor's doorbell, he knew how much the Debtor owed on the Residence to "within a few thousand dollars" and he had a personal opinion about the value of the property based on what would be required to sell it. The Court has determined that the Residence was worth $164,750.00 on the Transfer Date, and the Debtor testified that the principal due on the note was approximately $54,000.00 and that approximately $19,000.00 of fees and costs had accrued. Accordingly, the Court finds the Defendants knew the Debtor had somewhere in the range of $90,000.00 of equity in the property. Even if the Court were to attribute the full amount of consideration the Defendants claim they gave, the disparity in consideration to value is still too vast for the Court to reach any other conclusion than that the Defendants knowingly took unfair advantage of the Debtor. Accordingly, the Court finds the Defendants did not act in good faith.

Notwithstanding the lack of good faith on the part of the Defendants, the Court believes MAK should retain a lien for that portion of the Cumulative Consideration that paid direct obligations of the Debtor. Therefore, the Defendants are not entitled to a replacement lien pursuant to § 548(c) for Cumulative Consideration paid by MAK. However, as a matter of equity, the Court will award MAK a lien for that portion of the Cumulative Consideration attributable to principal payments on the first mortgage and real estate taxes on the Residence that were not covered by the Debtor's adequate protection payments.[6] Cf. Dahar v. Jackson (In re Jackson), 318 B.R. 5, 27 (Bankr. D.N.H. 2004). The evidence presented at trial was not

---

[6] On August 12, 2005, the Court issued an adequate protection order in the main case (Doc. No. 16) (the "Adequate Protection Order"), which required the Debtor to pay the Defendants $967.03 per month, payable on the 22nd of each month, commencing on August 22, 2005 (the "Adequate Protection Payments"). On June 15, 2006, the Court entered an Order granting MAK relief from the automatic stay (Doc. No. 38) (the "Stay Relief Order") pursuant to MAK's affidavit of non-compliance with the Adequate Protection Order.

sufficient for the Court to determine the amount MAK paid toward principal on the mortgage, the real estate taxes and the amount of credit for that portion of the Adequate Protection Payments made by the Debtor that are allocable to such principal payments and real estate taxes. Accordingly, the Court shall order MAK to file a financial accounting regarding these expenditures.

### B. Unfair or Deceptive Acts

In Count II, the Trustee asserts the Defendants violated NH RSA 358-A, the New Hampshire Consumer Protection Act. The CPA, which generally proscribes unfair or deceptive trade practices and delineates specific types of conduct that qualify as unfair or deceptive trade practices, provides in relevant part:

> It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following . . . .

RSA 358-A:2 (1999 & Supp. 2003).

Although the general provision of the CPA is broadly worded, the New Hampshire Supreme Court has recognized that some conduct in the course of trade or commerce falls outside its scope. Barrows v. Boles, 141 N.H. 382, 390 (1996). The New Hampshire Supreme Court employs the "rascality test" from Barrows to determine which commercial actions, not specifically delineated, are covered by the CPA. See Milford Lumber Co. v. RCB Realty, 147 N.H. 15, 17 (2001). Under the rascality test, "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. To prevail under the CPA the Trustee has the burden of proving, by the

13

preponderance of the evidence, that the Defendants' actions were unfair or deceptive to the degree defined in the Barrows rascality test.

The Trustee did not provide any evidence the Transaction was unfair. In fact, the Debtor testified that he understood and agreed to the essential elements of the Transaction – that by June 30, 2005, he had to sell the Residence or he would have to move out that day and reimburse the Defendants for the money spent on his behalf plus a $25,000.00 fee. Because the Debtor understood and willingly entered into this deal, the Court does not find that the Transaction was unfair.

The Trustee, however, did claim that Colsia's behavior on the Transaction Date was deceptive as well as unethical, oppressive, or unscrupulous. In particular, the Trustee asserted that Colsia took unfair advantage of the Debtor when he was "frantic, distraught, and overwhelmed" by mischaracterizing the Transaction as a refinancing to "save" the Debtor's residence and leading the Debtor to believe he was merely granting Colsia a lien on his residence. The Defendants deny that Colsia mischaracterized the transaction and counter that he made the nature of the Transaction crystal clear at all times. This diametrically opposed testimony is a classic case of "He said; I said" from which the Court cannot determine what actually transpired on the Transaction Date.

While the Court recognizes that a lay person might confuse the word "reinstate" for "refinance," the evidence presented at trial supports the Defendants' characterization of what transpired that day. In particular, the fact that the Debtor signed a document that was clearly captioned as a Sales Agreement, after having had previously signed two Sales Agreements with prospective buyers, belies his assertion that the documentation was misleading. Furthermore, the

14

Sales Agreement did not contain any repayment terms and even if the Debtor thought it was a refinancing deal, he understood that any such option would cease on June 30, 2005, if he was unable to close the sale to Courtney. Additionally, the Debtor sent Colsia a letter on June 11, 2005, requesting the right to substitute another buyer for Courtney so he would not be rendered "homeless" on June 30. This letter is a clear admission the Debtor understood he would lose all rights in the Residence as of June 30, 2005. Finally, the Debtor had the opportunity to think about what he was doing before he signed the Sales Agreement and Deed. Undisputed testimony establishes that 1-1/2 hour lapsed between when the Colsia and the Debtor hand drafted their understanding and when Colsia returned with a notary and the form documents, which he reviewed with the Debtor before the Debtor signed them. This evidence taken as a whole indicates that, while there may have been some confusion as to terminology, the Debtor was not deceived about the ultimate terms of the deal. The Court finds the Trustee failed to prove by a preponderance of the evidence that Colsia's actions were in violation of the CPA. Accordingly, the Trustee shall be denied recovery under his claim that the Defendants violated the CPA.

### C. Common Law Fraud

To establish a claim of common law fraud, a plaintiff must prove by clear and convincing evidence that "the defendant made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely on it," and the reliance must be justifiable. Sanderson v. Scrutin, 145 N.H. 73, 77 (2000). For the reasons stated in the previous section, the Court finds the Trustee has not met his burden of proof on the common law fraud count. Accordingly, the Trustee shall be denied recovery under his claim of common law fraud.

### D. Colsia's Personal Liability

To prevail on a claim that Colsia is personally liable, the Trustee would have to have proven the elements required to pierce the corporate veil. No evidence was presented on this issue. Accordingly, the Court finds that Colsia is not personally liable.

### E. Damage to MAK Caused by Debtor's Breach

MAK filed a counterclaim against the Trustee asserting the Debtor's failure to vacate the Residence on June 30, 2005, was a breach of his obligations under the Sales Agreement and claiming it was due an award for the damages caused by the breach. Because the Court has found that the Transaction was a fraudulent transfer that is avoided under § 548(a), the Debtor's obligations under the Sales Contract are avoided. Accordingly, the Court finds the Debtor did not breach the Sales Agreement and, therefore, MAK shall be denied recovery under its counterclaim for breach of contract. Any quantum meruit claim by MAK is more than covered by that portion of the Adequate Protection Payments not attributed to mortgage principal and real estate tax payments.

## IV. CONCLUSION

For the reasons stated above, the Court concludes the Transaction is avoidable pursuant to 11 U.S.C. § 548(a)(1). The Court, therefore, concludes the Adequate Protection Order and the Order Granting Relief from Stay entered in the main case should be vacated. Accordingly, the Court shall issue a separate order in the main case vacating the Adequate Protection Order and the Stay Relief Order. The Court further concludes that MAK is entitled to a lien against the Residence, in an amount yet to be determined, for the portion of the Cumulative Consideration

that paid the direct obligations of the Debtor that were not covered by the Debtor's Adequate Protection Payments. Accordingly, the Court shall issue a separate order requiring MAK to file an accounting of all principal and real estate taxes paid by the Defendants and the Debtor. After consideration of the accounting, the Court will enter a separate judgment:

1. In favor of the Trustee and against the Defendants based upon the transfer of the Residence being constructively fraudulent under 11 U.S.C. § 548(a)(1).

2. In favor of the Defendants and against the Trustee for all claims based on NH RSA 358-A and common law fraud.

3. In favor of MAK granting a lien on the Residence pursuant to 11 U.S.C. § 548(c) in an amount to be determined by the Court in accordance with this opinion.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment consistent with this opinion.

ENTERED at Manchester, New Hampshire.

Date: August 17, 2006

/s/ J. Michael Deasy
J. Michael Deasy
Bankruptcy Judge